BOEHL, APPELLEE, *v.* MAIDENS, APPELLANT.

(No. 8184—Decided November 26, 1956.)

*Mr. Robert E. Bernens,* for appellee.

*Mr. Alton E. Purcell* and *Mr. Stephen W. Young,* for appellant.

MATTHEWS, J. This is an appeal from a judgment for the plaintiff for $1,800 in an action for breach of a contract that contemplated but did not bind the plaintiff to transfer to the defendant a business known as Boehl's Musical Bar.

The case was heard by the trial court without a jury, and, upon the request of the defendant, the court made a separate finding of facts and conclusions of law on the issues raised by the petition and the answer and cross-petition of the defendant. The defendant has brought to this court a bill of exceptions containing all the evidence upon which the finding of facts was

based. We, therefore, deem it unnecessary to consider whether the finding of facts is sufficient basis for the conclusion of law that the plaintiff was entitled to recover.

The contractual intent of the parties is found in two written documents. The first is dated July 29, 1953. The second was executed a few days thereafter, probably on or before August 4, 1953, but bears no date.

From the terms of the agreement itself, as well as the evidence, it appears that the plaintiff owned this restaurant and saloon business known as Boehl's Musical Bar and had operated it for several years. The result of her operation was such that by July 1953 she admittedly owed $21,267.85, and, as stated in the written agreement itself, her reason for desiring to sell was "due to financial difficulties."

Shortly prior to the execution of the agreement she was visited by one of her largest creditors, accompaniel by his attorney. Her financial condition was the subject of discussion and she expressed a desire to sell the business. She showed her visitors a list of creditors. The upshot of the conference was that the attorney sought out the defendant and this agreement was entered into.

The written agreement took the form of an offer by the defendant to buy the entire business, including the fixtures, all chattel property located on the premises, and a D-5 permit together with the good will and trade name, for which the defendant was to assume the payment of the creditors listed on the agreement, and in addition was to pay the plaintiff $2,500 upon the transfer of the property. It was also agreed that if the debts exceeded $21,267.85, the excess should be deducted from the $2,500, otherwise payable to the plaintiff, so that the total purchase price would in no event exceed $23,767.85.

It was agreed that, pending the completion of the sale, the defendant should take over the operation of the business as the plaintiff's manager, with full power and authority to operate the business as though he were the owner, to contact creditors, and to compromise and pay off the listed debts on such terms as could be agreed upon with the creditors. All money advanced by defendant to discharge these debts should be a part of the

consideration for the transfer of the business, and merchandise bought by defendant with his own funds should be his property.

The plaintiff agreed that she would not entertain any other offer for the business until this contract had been terminated, which could be accomplished either by the transfer of the business and license to the defendant, or by the discontinuance of the managership, in which latter case the plaintiff agreed to reimburse the defendant for whatever of his own money he may have expended, and in addition pay him reasonable compensation for his services as manager.

By the second or supplemental agreement, the defendant agreed to pay the plaintiff $75 per month, to be credited upon the $2,500 purchase price, and also agreed to pay to Western Bar & Fixture Company $120 per month, to John Lamb $100 per month, and to Bernard Wolke $100 per month until the transfer was completed, and to pay all other debts to the best of his ability.. There was the further provision that should the managership be terminated other than by transfer of the business to defendant, the inventory as listed existing on August 4th should be restored.

There was no provision for compliance with the bulk-sales law. As noted, the purchaser was required in some way to liquidate all debts.

It is apparent from the recitals in this agreement, signed by both parties, that the maximum equity of the plaintiff was less than 11%, and that, even to salvage that much, it was necessary to dispose of it as a going concern in order to capitalize the trade name and good will. And the plaintiff's testimony on cross-examination shows that unlisted debts almost equalled $2,500, so that as a matter of actuality when this contract was entered into she had very little, if any, beneficial interest in the business.

This business was located in premises, separate parcels of which were rented from different landlords. The rent was past due on one parcel. The defendant surrendered this portion and paid the past due rent, although it had not been listed.

The defendant entered upon the managership of this business and continued to do so for about nine months, during which his gross receipts were $25,058.59. During the six months

from January 1, 1953, to June 30, 1953, while the plaintiff was managing the business, her gross receipts were $11,525.93, which certainly does not seem to justify the allegation in the plaintiff's petition that the defendant caused the business to be so operated "as to jeopardize plaintiff's entire investment causing a loss of business and undue wear on plaintiff's property."

There is no contradiction of the testimony that the defendant furnished from his own funds the money required to replenish the stock with which he started his managership, that during his managership he took nothing whatever from the business for his personal use, and, further, as a result of his managership, in addition to the payments he had made from the receipts of the business, he had expended $7,500 in payment of the debts, listed and unlisted, of the business.

Through his attorney, the defendant wrote a letter to the plaintiff on April 29, 1954, informing her that, as a result of an audit of the business, the defendant had discovered the amount which he had paid and the amount of the unlisted debts exceeded the entire purchase price, and, therefore, he would not pay her any more on the purchase price. In that letter he recognized his obligation to pay the debts of the business, both listed and unlisted.

On May 17, 1954, the plaintiff, during the absence of the defendant, changed the lock on the door and took possession of the business and the records, and thereafter continued to exclude the defendant therefrom. She did not reimburse the defendant for his expenditures, or pay him for his services as manager.

On December 1, 1954, this action was filed. In her petition, plaintiff alleged that the defendant had violated the terms of his agreement in several respects: lack of efficient management of the business; failure to pay the rental of the premises; failure to pay Ohio sales tax and unemployment tax; failure to pay personal property tax; failure to pay John Lamb $100 per month; failure to pay Western Bar & Fixtures Company $120 per month; failure to pay Bernard Wolke $100 per month; failure to pay plaintiff $75 per month; and conversion of various articles of personal property used in the conduct of the

business and damage to all the property, all in the sum of $5,000. She also asked for damages of $2,465.63, for the amount of the foregoing unpaid debts that were incurred under defendant's management.

The defendant, by cross-petition, asked judgment for $2,700, which he alleged he expended out of his own funds, for $4,300, as compensation for his services as manager, and $1,000 as damages for failure to convey the business to him, all in the sum of $8,000.

It will be noted that defendant testified that he had expended $7,500 from his own funds, whereas, in his cross-petition he alleged that he had expended $2,700. On being questioned by the court, he testified that when plaintiff locked him out the books were in the restaurant and he did not regain possession until after he had filed his cross-petition, and that fact and the fact that certain payments were made thereafter account for the difference.

We find from the evidence that the defendant either restored or accounted for the absence of the articles of personal property, for which the plaintiff asked damages. And, of course, if the defendant was entitled to have a transfer of the property at the time the plaintiff seized possession and repudiated the contract, this question became immaterial.

The trial court based its judgment upon its finding that the plaintiff had a right under the contract to terminate it at will, without notice, and thereupon was entitled to recover the value of the original inventory not returned and the unpaid balance of the $2,500 mentioned in the contract.

We find ourselves unable to agree with these conclusions of the trial court.

The contract expressly places conditions upon the plaintiff's right to terminate the contract. It clearly required her to reimburse the defendant for the money he had expended and also to pay him reasonable compensation for his services as manager.

If the plaintiff had the right to terminate this contract at the time she ousted the defendant from possession, it resulted, not from the express terms of the contract, but by operation of law, because of a material breach of the contract by the de-

fendant. A careful consideration of the evidence convinces us that the defendant had made an effort in good faith to perform the manifold duties of manager in accordance with the contract and had succeeded in substantially performing all the duties imposed upon him, and that to permit the plaintiff to recover in this action would unjustly enrich her by the part performance which would thereby inure to her. However, assuming a breach, we still are of the opinion that it would not have the effect of justifying the plaintiff's action.

In 17 Corpus Juris Secundum, 982, Section 476, it is said:

"Where there are several terms in a contract, a breach committed by one of the parties may be a breach of a term which the parties have not, on a reasonable construction of the contract, regarded as vital to its existence. Such a term is said to be subsidiary, and a breach thereof does not discharge the other party. He is bound to continue his performance of the contract, but may bring an action to recover such damages as he has sustained by the default.

"The prevailing rule is that, where a promise is to be performed in the course of the performance of the contract, and after some of the consideration of which it forms a part has been given, it will be regarded as subsidiary, and its breach will not effect a discharge unless there are words expressing that it is a condition precedent, or unless the performance of the thing promised is plainly essential to the contract."

The same principle is stated in 3 Williston on Contracts (Rev. Ed.), Section 841, as follows: "Lord Mansfield decided soon after his recognition of the dependency of promises in bilateral contracts that where there had been part performance by the plaintiff and a breach of promise by him went only to part of the consideration and could be compensated in damages the plaintiff might recover in spite of such breach. The principle thus established has been uniformly followed."

As is pointed out by Williston, in Section 844, this principle has no application where the breach is at the very outset of performance.

Our conclusion is that the judgment dismissing the defendant's cross-petition and rendering judgment for the plaintiff for $1,800 is manifestly against the weight of the evidence, and,

for that reason, the judgment is reversed and the cause remanded for further proceedings according to law.

*Judgment reversed.*

Ross, P. J., and HILDEBRANT, J., concur.