Defendant-appellant Dae Kee Yun (hereafter "defendant") appeals from an order that quieted title to certain real property in favor of plaintiff-appellee Equity Inns Partnership, L.P. (hereafter "plaintiff"). Ruling on the parties' cross motions for summary judgment, the court entered a final judgment in favor of plaintiff on its complaint to quiet title and on defendant's amended counterclaim for breach of contract and specific performance. Defendant asserts that summary judgment was inappropriate because there existed genuine issues of material fact as to whether defendant had an interest in the property and whether plaintiff frustrated the defendant's performance. We conclude that the trial court was correct in granting summary judgment in plaintiff's favor. Accordingly, we affirm.
This controversy arises from an agreement that initially did not involve either of the parties. On December 28, 1988, Westlake Associates, as Lessor, entered into a Ground Lease with Thomas J. Unik, Trustee, and R.G.I. Investments, as Lessees, for certain real property located on Detroit Road in Westlake, Ohio.[1]
Section 2.01 of the lease established the lease's term at ninety-nine years commencing on December 15, 1988.[2] Under Section 2.03, the lessee was required to pay $150,000 by November 1, 1989, as advance rent for the entire initial term of the lease.[3]
Section 11.02 of the lease authorized the lessor to terminate the lessee's right of possession if any event creating default occurred. The lessee's "abandonment" of the leased land and improvements would constitute a default under Section 11.01(d), which provided:
 Lessee's abandonment of the leased land and improvements shall constitute a default under this lease. For the purposes of this Lease, "abandonment" shall be defined as Lessee's failure to begin construction of Improvements within five years following the date of this Lease.
It is undisputed that this section required construction of improvements to begin by December 28, 1993.[4]
On November 1, 1989, lessees Unik and R.G.I. Investments, with the consent of the lessor, assigned all of their right, title, and interest in the lease to defendant. Defendant agreed that the assignment contained all the covenants and agreements contained in the lease and that he would become the sole lessee. Defendant accordingly paid advance rent in the sum of $150,000.
Buildings, structures, or other improvements could not be constructed on the property without first obtaining a building permit from the City of Westlake. There were three stages to obtain a building permit: an applicant had to submit an application for a development plan; the city planning commission had to recommend either approving or disapproving the proposed development plan to the city council; and the city council had to approve the proposed development plan.
By approximately July 1993, defendant retained architect Victor Probst to prepare plans and blueprints for the construction of the proposed restaurant. On August 12, 1993, Probst submitted an incomplete application requesting the Westlake Planning Commission's approval for the proposed restaurant and a set of proposed blueprints. Probst submitted a complete application on September 23, 1993, and Westlake began processing the application that day upon the payment of the $500 review fee. On January 12, 1994, defendant submitted revised drawings and blueprints. Defendant submitted further revised drawings and blueprints on March 23, 1994. He submitted a survey for the proposed restaurant on March 28, 1994. On April 11, 1994, defendant submitted five revised drawings and blueprints to the Westlake planning director.
Apparently unbeknownst to defendant, original lessor Westlake Associates conveyed all of its right, title, and interest in the subject real property to plaintiff Equity Inns on or about March 1, 1994. On April 15, 1994, plaintiff's chairman and chief executive officer, Phillip H. McNeill, Sr., wrote to the Westlake planning commission's planning director to advise him of plaintiff's acquisition of the property and that plaintiff had not had any contact with the defendant on matters pertaining to the defendant's proposed improvements. McNeill's April 15, 1994 correspondence said in closing: "In summary, until such time as we have such discussions with the Lessee and all of the various legal and business requirements set forth in the lease are complied with; [sic] we request you withhold any approval of their application."
Upon learning of plaintiff's acquisition, architect Probst sent McNeill on April 18, 1994 the five revised drawings which had been submitted to the Westlake planning director on April 11, 1994. Probst later averred that he requested plaintiff's review and approval of the drawings but that Probst never received any response from plaintiff. For his part, McNeill testified in deposition that he noted his concerns on the April 11, 1994 plans and sent them to either Probst or the defendant, but McNeill did not retain a copy of his response.
By April 21, 1994, the Westlake Planning Department had identified five remaining issues that prevented the planning commission from approving defendant's April 11, 1994 drawings. Defendant and/or his counsel then began a series of correspondences to plaintiff that sought plaintiff's cooperation in order to resolve the planning department's outstanding concerns. Defendant claims that other than an April 29, 1994 correspondence in which McNeill agreed to meet with the defendant and his counsel in Memphis, Tennessee, McNeill did not respond to the defendant's follow-up inquiries dated May 5, 1994; May 6, 1994; May 27, 1994; or June 3, 1994.
On June 22, 1994, plaintiff, by and through McNeill, gave notice to the defendant that defendant was in default under Section 11.01(d) of the lease by having failed to begin construction of improvements within five years of December 28, 1988, that is, by December 28, 1993. Plaintiff thereby gave notice that the defendant's right, title, and interest as lessee was terminated and that it was required to quit and surrender the property. On October 12, 1994, defendant notified plaintiff that he intended to exercise the option to convert the lease to a purchase under Section 2.04 of the lease.
Plaintiff then filed this action on October 21, 1994 to quiet title, and defendant asserted a counterclaim against plaintiff for breach of contract and specific performance. The matter proceeded on cross-motions for summary judgment. Granting plaintiff's motion and denying defendant's motion, the trial court quieted title to the property in favor of the plaintiff as the complaint requested and entered judgment in plaintiff's favor on the defendant's counterclaim.
Defendant's appeal presents four assignments of error:
 I. THE TRIAL COURT ERRED IN GRANTING APPELLEE'S (EQUITY INNS') MOTION FOR SUMMARY JUDGMENT ON APPELLEE'S ACTION TO QUIET TITLE.
 II. THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT ON APPELLANT'S COUNTERCLAIM FOR BREACH OF CONTRACT.
 III. THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT ON APPELLANT'S COUNTERCLAIM FOR SPECIFIC PERFORMANCE.
 IV. THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT ON APPELLANT'S COUNTERCLAIM FOR RETURN OF RENTS PAID UNDER THE LEASE.
Defendant's brief does not separately argue these assignments of error but instead advances each as sub-arguments to his essential contention that the court erred in awarding summary judgment to the plaintiff. We find that the assignments of error are not well taken for the reasons that follow.
A summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) after construing the evidence most favorably for the party against whom the motion is made, reasonable minds can reach only a conclusion that is adverse to the nonmoving party. Zivich v. Mentor Soccer Club,Inc. (1998). 82 Ohio St.3d 367, 369-370; Temple v. Wean United,Inc. (1977), 50 Ohio St.2d 317, 327. To obtain a summary judgment under Civ.R. 56(C), the moving party bears the initial responsibility of informing the court of the basis for the motion and identifying those portions of the record which support the requested judgment. Vahila v. Hall (1997), 77 Ohio St.3d 421,430. If the moving party discharges this initial burden, the party against whom the motion is made then bears a reciprocal burden of specificity to oppose the motion. Id. See, also,Mitseff v. Wheeler (1988), 38 Ohio St.3d 112. We review the trial court's judgment de novo and use the same standard that the trial court applies under Civ.R. 56(C). See Renner v. Derin AcquisitionCorp. (1996), 111 Ohio App.3d 326, 333; N. Coast Cable L.P. v.Hanneman (1994), 98 Ohio App.3d 434, 440.
We begin our review here by noting that a ninety-nine-year renewable lease has been characterized as "a leasehold estate in name and in form only." Worthington v. Hewes McCann (1869),19 Ohio St. 66, 75. The ninety-nine-year renewable lease was said to create "a freehold estate in real property * * *." Ralston SteelCar Co. v. Ralston (1925), 112 Ohio St. 306, syllabus at para. 1. See, also, Welfare Federation of Cleveland v. Glander (1945),146 Ohio St. 146, syllabus at para. 6. While the permanent leasehold estate had many of the incidents of a fee simple estate, it did not, however, constitute a fee simple estate and the fee, simple remained in the lessor, its heirs, devisees, or assigns. Rawsonv. Brown (1922), 104 Ohio St. 537, syllabus at para. 1; Smith v.Harrison (1884), 42 Ohio St. 180. "The only interest left in a fee owner who grants a ninety-nine-year lease, renewable forever, is a possibility of reverter, the right to receive the stipulated rental or consideration, and the right to enforce performance of other contractual covenants contained in the lease." WelfareFederation of Cleveland v. Glander, supra, syllabus at para. 5. This included the lessor's "right to claim a forfeiture in the event of nonperformance of the conditions * * *." Ralston SteelCar Co. v. Ralston, supra, 112 Ohio St. at 309-310. An assignee of the lessee was bound by the terms of the lease. See Gusman v.Mathews (1928), 29 Ohio App. 402.
In the case at bar, defendant does not dispute that he was bound to the terms of this ninety-nine-year renewable lease. But he does contest the judgment quieting title to the property in favor of the plaintiff. He contends that reasonable minds could differ as to whether defendant had a cognizable interest in the property. R.C. 5303.01 states, in part, that a quiet title action may be brought "by a person out of possession, having, or claiming to have, an interest in remainder or reversion in real property, against any person who claims to have an interest therein, adverse to him, for the purpose of determining the interests of the parties therein." In an action to quiet title,
 [t] he burden of proof * * * rests with the complainant as to all issues which arise upon essential allegations of his complaint. He must prove title in himself if the answer denies his title or if the defendant claims title adversely. The burden rests upon the defendant to establish a title which he has set up to defeat the complainant's claim of ownership.
Duramax, Inc. v. Geauga Cty. Bd. of Commrs. (1995), 106 Ohio App.3d 795,799 (citations and internal punctuation omitted).
In this case, plaintiff notified defendant on June 22, 1994 that defendant's failure to begin construction of improvements within five years after the lease was executed on December 28, 1988, that is, by December 28, 1993, was an abandonment of the leased land and improvements constituting a default under Section 11.01(d). Section 11.02 of the lease provided:
 Subject to the provisions of Article 10, if any event creating default occurs, Lessor may elect to terminate Lessee's right of possession under this Lease after Ninety (90) days from the date of service of notice of the election. If this notice is given, then at the expiration of the thirty days all Lessee's rights, title, and interest in the Leased Land shall expire completely, and Lessee shall quit and surrender the Leased Land and any Improvements erected on the Leased Land to Lessor.[5]
Section 11.03 of the lease provided:
 At any time after the termination of Lessee's right of possession under this Lease pursuant to Paragraph 11.02 of this Lease, Lessor may enter and possess the Leased Land and Improvements by summary proceedings, ejectment, or otherwise, and Lessor may remove Lessee and all other persons and property from the Leased Land and Improvements. If Lessor takes the actions described in this Paragraph 11.03, Lessor may then possess the Leased Land and Improvements and assume the right to receive all rents, income, and profits from the Leased Land and Improvements, and Lessor may also sell any of the Improvements.
For this appeal, defendant no longer disputes the fact that he did not begin construction of improvements within five years following the date of the lease, that is, by December 28, 1993. Defendant, nevertheless, maintains that this fact is not determinative as to whether he retained a valid right and interest in the property. We do not agree.
Defendant's admitted failure to begin construction of improvements by December 28. 1993 constituted a default under Section 11.01(d) and thereby caused the lease to be subject to termination for default under Section 11.02. By plaintiff's June 22, 1994 notice that plaintiff was terminating defendant's right of possession under the lease, any right, title, and interest defendant had in the leased property expired by operation of Section 11.02. It follows that defendant could not claim title to the property, because title had reverted to the plaintiff.
Defendant insists that he began the process of construction by applying to Westlake for a building permit prior to December 28, 1993, but that plaintiff failed to cooperate with defendant's requests for assistance and thereby frustrated defendant's attempts to begin construction. But any failure by plaintiff to cooperate occurred after December 28, 1993, by which date defendant's interest in the lease was already subject to termination for default. Evidence of plaintiff's alleged failure to cooperate after defendant defaulted for "abandonment" does not enhance defendant's claim to title in the property.
Defendant relies on certain lease provisions that he contends grant him a legal interest in the property sufficient to challenge plaintiff's claim to title, but we are not persuaded. Defendant's ability to seek a refund for rent paid pursuant to Section 2.06 in the event that the City of Westlake refused to issue a building permit is not persuasive because Westlake did not officially refuse to issue the permit. Nor did defendant ever ask Westlake for a definitive ruling on this point. Moreover, the right to a refund in the event that performance was impossible still would not enhance defendant's claim to title to the property once plaintiff terminated the lease and defendant's right thereafter expired under Section 11.02. Likewise, the option to purchase the property under Section 2.04 does not defeat plaintiff's claim to title because defendant did not obtain Westlake's approval for a lot split and still had no claim to title after his interest expired. The fact that defendant initiated the process to obtain approval from the City of Westlake before December 28, 1993 or even before plaintiff gave notice of its intent to terminate the lease did not bar plaintiff from exercising its right to terminate the lease upon the occurrence of a default.
We agree with defendant that a forfeiture clause in a lease must be strictly construed and that forfeiture should not be decreed in the absence of an express stipulation in the parties' lease agreement. See Layne v. Baker (1949), 86 Ohio App. 293;Fairbanks v. Power Oil Co. of Ohio (1945), 81 Ohio App. 116. We are also mindful that equitable considerations at times may weigh against a finding that conduct should result in a forfeiture of a leasehold interest. See, e.g., Gorsuch Homes, Inc. v. Wooten
(1992), 73 Ohio App.3d 426 (trial court erred in failing to consider equities before ordering forfeiture of tenant's subsidized housing tenancy for failure to pay for vandalism);Southern Hotel Co. v. Miscott, Inc. (1975), 44 Ohio App.2d 217
(trial court correctly considered equities before refusing to order forfeiture of tenant's leasehold for nonpayment of rent).
But Ohio law clearly recognizes that forfeiture may be enforced on specified conditions. See Ralston Steel Car Co. v. Ralston,supra; Quill v. R.A. Investment Corp. (1997), 124 Ohio App.3d 653. Thus when parties enter into a commercial lease from equal bargaining positions and their lease expressly authorizes forfeiture upon the occurrence of default, the courts are bound to enforce such a provision. In Joseph J. Freed Assoc., Inc. v.Cassinelli (1986), 23 Ohio St.3d 94, the Supreme Court of Ohio upheld the enforcement of a lease forfeiture when a commercial tenant in a shopping mall did not adhere to the mall owner's policy that required mall tenants to be open for business during minimum specified business hours. And in Garage Cleveland, Inc.v. City of Cleveland (Feb. 1, 1990), Cuyahoga App. No. 57630; unreported, this court reviewed a lengthy bench trial which showed the landlord had canceled a lease because the commercial tenant did not begin construction by the specified date. This court upheld the judgment rendered against the tenant.
Similarly, in the case at bar, we have a commercial lease between comparably sophisticated parties. Their lease specifically identified circumstances that would constitute a default and authorized the plaintiff's election to terminate defendant's right of possession in the event of a default. The undisputed facts demonstrate that defendant did not begin construction of improvements by December 28, 1993 as required by the lease and defendant thus placed himself in the position of being in default and subject to termination of the lease. Once the plaintiff exercised its right to terminate the lease, then defendant's right, title, and interest in the property expired by operation of Section 11.02 of the lease. On this record, reasonable minds can only conclude that defendant did not establish a valid claim to title and that title was correctly quieted in favor of plaintiff. The first assignment of error is therefore overruled.
Defendant likewise did not demonstrate that material issues of fact existed to permit him to proceed on his counterclaims for breach of contract, specific performance, or return of rents paid. Defendant contends that plaintiff failed to cooperate with defendant's efforts to obtain a building permit from Westlake. In particular, Section 3.03 of the lease stated:
 Lessor shall assist Lessee in applying for and obtaining any zoning changes or variances, use permits, or building permits necessary for the construction of buildings or other improvements on the Leased Land, except that Lessee shall solely bear the cost, including Lessee's own legal fees, of any such application. Lessors [sic] assistance shall be limited to the execution of necessary documents and the appearance by representatives at appropriate meetings of city officials.
Section 3.04 of the lease further provided:
 Notwithstanding any other provision contained in this Lease, Lessor shall have a right to review all designed plans for the buildings and improvements to be constructed on the property and no such buildings or improvements shall be constructed without the Lessor's approval of design, architecture, colors and all other necessary matters to insure that the facility does not detract from the appearance of the improvements presently on Lessor's property. Such approval shall not be unreasonably withheld by Lessor.
Defendant maintains that his failure to commence construction should be excused because plaintiff's alleged failure to cooperate was a breach of contract that prevented defendant from securing the necessary building permit from Westlake. In Suter v.Farmers' Fertilizer Co. (1919), 100 Ohio St. 403, the syllabus at paragraph 4 states:
 Where the obligations arising under a contract have attached, and subsequent thereto one party without the consent of the other does some act or makes some new arrangement which prevents the carrying out of the contract according to its terms, he cannot avail himself of this conduct to avoid his liability to the other party.
See, also, Dynes Corp. v. Seikel, Koly Co., Inc. (1994),100 Ohio App.3d 620.
But defendant's evidence does not suggest that the lessor failed to cooperate or otherwise unreasonably withheld its approval at any time before the construction of buildings or other improvements was due to have commenced, that is, before December 28, 1993. Indeed, plaintiff did not acquire its interest in the lease until March 1, 1994. Even after construing the evidence most favorably to the defendant, we must conclude that plaintiff's alleged failure to cooperate did not prevent defendant from commencing construction before December 28, 1993. We therefore overrule defendant's second assignment of error.
Defendant next contends that issues of fact exist to show he was entitled to specific performance to exercise the option to purchase the property by Section 2.04, which provided:
 Lessee shall have the unconditional and continuing right to convert this lease to a purchase of the property and have title conveyed to it by lessor, free and clear of all encumbrances, except as set forth in paragraph 1.02 herein, at such time as Lessee is able to obtain Lot Split approval from the City of Westlake. (Emphasis added.)
But the option to purchase the property could not ripen into an enforceable contract unless its conditions were met. Because defendant did not obtain approval from Westlake to split the lot, defendant could not obtain specific performance to exercise the purchase option. In Valentine v. Clippinger (1965), 4 Ohio App.2d 303, the court denied specific performance to exercise a purchase option because the conditions precedent had not occurred:
 The option to purchase contained certain conditions precedent in addition to notification of the election to purchase. The option to purchase could not ripen into an enforcible [sic] contract until such conditions were met. The failure on the part of Mrs. Valentine to comply with these conditions now prevents her from securing the specific performance or, in the alternative, the damages she seeks.
Id., 4 Ohio App.2d at 305. Because defendant similarly did not meet the conditions precedent necessary to exercise the purchase option, we overrule his third assignment of error.
Defendant lastly contends that triable issues of fact exist that would entitle him to a refund of the $150,000 rent he paid in advance. His claim was predicated on Section 2.06, which stated:
 Notwithstanding any provision to the contrary contained in this agreement, Lessee shall be entitled to a full refund of all monies paid to the Lessor for rent if the City of Westlake refuses to issue a building permit to the Lessee for the construction of its restaurant facility because of any Zoning or Building requirement Lessee is unable to fulfill because of the location of the demised premises, its size, lack of lot split and other matters relating to the zoning ordinances of the City of Westlake and that refusal is sustained by Court appeal by the Lessee. Lessee shall be required to exhaust all legal remedies to the satisfaction of the Lessor before Lessor is required to return such funds. Nevertheless, Lessee shall have been determined to have exhausted all legal remedies, upon the rendering of a judgment in such matter by the Court of Common Pleas with competent jurisdiction. In such event, this agreement and all agreements executed in accordance with it shall be null and void and each party shall be returned to their original position without any right of action of any kind against the other.
Westlake's refusal to issue a building permit plainly represented a condition precedent for defendant to obtain a refund of the advance rent paid because performance was impossible. See Kallins v. Rex (1955), 103 Ohio App. 108
(obtaining board of zoning appeal approval for lease was condition precedent, the absence of which rendered performance impossible). Nothing in the record suggests that Westlake refused to issue a building permit to defendant as a result of any zoning or building requirements defendant was unable to fulfill because of the location of the demised premises, its size, lack of lot split, or other matters relating to Westlake's zoning ordinances or that any such refusal was sustained by judicial appeal.
Defendant again insists that plaintiff's failure to cooperate prevented defendant from obtaining a definitive determination from Westlake on the building permit necessary to begin construction. But defendant does not identify any authority that required plaintiff to continue performance after defendant defaulted by abandonment. It is true that "[a] breach of a portion of the terms of a contract does not discharge the obligations of the parties to the contract, unless performance of those terms is essential to the purpose of the agreement."Software Clearing House, Inc. v. Intrak, Inc. (1990), 66 Ohio App.3d 163,170. See, also, Kersh v. Montgomery DevelopmentalCtr. (1987), 35 Ohio App.3d 61; Boehl v. Maidens (1956),102 Ohio App. 211. There can be little doubt that construction of improvements was essential to the purpose of the lease in the case at bar. And as we have noted, plaintiff's alleged failure to cooperate did not cause defendant to fail to commence construction before December 28, 1993 and did not prevent defendant from obtaining a definitive determination from Westlake before December 28, 1993. We therefore overrule defendant's fourth assignment of error.
After construing the evidence most strongly in defendant's favor, we remain convinced that there were no genuine issues of material fact and plaintiff demonstrated it was entitled to judgment as a matter of law. Accordingly, the judgment is affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TERRENCE O'DONNELL, P.J., and ANNE L. KILBANE, J.,CONCUR.
 _________________________________ DIANE KARPINSKI JUDGE
[1] According to Section 3.01, the lease's primary purpose was for the development and construction of a restaurant.
[2] By Section 2.02, the term would be automatically extended for an additional ninety-nine-year term for one dollar.
[3] Section 2.03 provided, in relevant part:
 Lessee agrees to pay Lessor, without notice or demand and without abatement, reduction, or set-off for any reason, One Hundred Fifty Thousand Dollars ($150,000) as and for advance rental for the premises. The Lessor shall have the unrestricted right to use such sum in the Lessors [sic] sole discretion and the sum so paid shall constitute an advance rental payment for the entire initial term of this lease. * * *
[4] We will discuss other relevant lease provisions when we address defendant's argument.
[5] Because Section 10.01 permitted the lessee to mortgage the lessee's interest to a leasehold mortgagee, Article 10 imposed certain limitations on the lessor's authority to exercise Article 11 remedies. For instance, Section 10.04 proscribed the lessor from exercising Article 11 rights for a "monetary default" unless the default continued for at least thirty days after notice to all leasehold mortgagees. For any "curable nonmonetary default," Section 10.05 barred the lessor from exercising Article 11 remedies unless the default continued for at least thirty days after notice of all leasehold mortgagees and, if it was not reasonably possible to cure default within thirty days, extended the lessee's time period to cure the default if the lessee acted diligently and in good faith to cure the default as expeditiously as practicable. For any other "noncurable default," including but not limited to bankruptcy or insolvency, Section 10.06 proscribed the lessor from exercising Article 11 remedies if a leasehold mortgagee notified the lessor within thirty days of the lessor's default notice that the mortgagee would foreclose its leasehold mortgage diligently and continuously. In this case, defendant's failure to begin construction of improvements by December 28, 1993 would presumably represent a "noncurable default," and we infer that there were no leasehold mortgagees in any event.