{¶ 96} I respectfully dissent, and I would reverse the judgment of the trial court.
 {¶ 97} First, unlike the majority, I do not interpret Section 5.1(b) of the Employment Agreement (the "contract") as the exclusive means by which OSU could terminate O'Brien for a breach relating to NCAA violations. Rather, as discussed below, I agree *Page 51 
with the conclusion the trial court reached in its June 22, 2005 decision denying O'Brien's request for summary judgment, i.e., that the plain language of paragraph 5.1(a) permitted OSU to terminate O'Brien for cause where a material breach occurred, even if the breach related to an NCAA violation.
 {¶ 98} The interpretation of a contract is a matter of law that we review de novo. Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,73 Ohio St.3d 107, 108, 1995-Ohio-214. Our purpose in interpreting contracts is to ascertain and effectuate the intent of the parties, and we presume that the intent of the parties resides in the language they chose to use. Graham v. Drydock Coal Co., 76 Ohio St.3d 311, 313,1996-Ohio-393. We must give ordinary meaning to common words appearing in a written contract unless "manifest absurdity" results, or unless the face or overall contents of the contract evidence some other meaning.Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241, paragraph two of the syllabus. If a contract is clear and unambiguous, we need not go beyond the plain language of the agreement to determine the parties' rights and obligations; instead, we must give effect to the agreement's express terms. Uebelacker v. Cincom Sys., Inc. (1988),48 Ohio App.3d 268, 271.
 {¶ 99} Here, the language at issue arises from Section 5.1 of the contract, entitled "Termination for Cause," which provides, in full:
 Ohio State may terminate this agreement at any time for cause, which, for the purposes of this agreement, shall be limited to the occurrence of one or more of the following: *Page 52 
 (a) a material breach of this agreement by Coach, which Coach fails to remedy to OSU's reasonable satisfaction, within a reasonable time period, not to exceed thirty (30) days, after receipt of a written notice from Ohio [S]tate specifying the act(s), conduct or omission(s) constituting such breach;
 (b) a violation by Coach (or a violation by a men's basketball program staff member about which Coach knew or should have known and did not report to appropriate Ohio State personnel) of applicable law, policy, rule or regulation of the NCAA or the Big Ten Conference which leads to a "major" infraction investigation by the NCAA or the Big Ten Conference and which results in a finding by the NCAA or the Big Ten Conference of lack of institutional control over the men's basketball program or which results in Ohio State being sanctioned by the NCAA or the Big Ten Conference in one or more of the following ways:
 (i) a reduction in the number of scholarships permitted to be allocated;
 (ii) a limitation on recruiting activities or reduction in the number of evaluation days;
 (iii) a reduction in the number of expense-paid, official recruiting visits;
 (iv) placement of the men's basketball program or Ohio State on probation;
 (v) being banned from NCAA post-season play for at least one season;
 (vi) being banned from regional or national television coverage for at lest one basketball season with a consequent loss by Ohio State of television revenues for at least one basketball season; or
 (c) any criminal conduct by Coach that constitutes moral turpitude or any other improper conduct that, in Ohio State's *Page 53 
reasonable judgment, reflects adversely on Ohio State or its athletic programs.
(Emphasis sic.)
 {¶ 100} Nothing in Section 5.1, or any other provision of the contract, suggests that Section 5.1(b) is the exclusive means by which OSU could terminate O'Brien for conduct related to NCAA violations. In fact, Section 5.1 allowed OSU to terminate "for cause" if "one or more" of the identified actions occurred, i.e., for material breach, NCAA violations meeting certain specified criteria, and criminal or other improper conduct. Thus, the unambiguous language of the contract indicates that conduct could fall under any one of the identified reasons or all of the identified reasons and still support a termination for cause.
 {¶ 101} It is not difficult to find a set of facts that demonstrate the reasonableness of giving subsections (a) and (b) independent meaning, as the NCAA enforcement proceedings related to, but having no substantive bearing upon, this case present a perfect example. In its March 2006 report, the NCAA Committee on Infractions found NCAA violations in the OSU men's basketball programs, and some of them related to the conduct at issue here. On appeal, however, the NCAA concluded that a statute of limitations barred an NCAA enforcement action on those violations.
 {¶ 102} Specifically, NCAA bylaws normally impose a four-year statute of limitations on NCAA violations. In other words, the NCAA may only investigate and take action on a violation within four years after it occurs; after four years, NCAA action on that violation is *Page 54 
time-barred. NCAA bylaws provide an exception to this four-year statute of limitations, however, where information about certain violations does not become available during the four-year period. In that case, the NCAA may obtain a one-year extension of time to pursue a violation, but to do so, the NCAA enforcement staff must "investigate and submit" an official inquiry to the subject institution within one year after the date information becomes available to the NCAA.
 {¶ 103} Here, the NCAA first learned about O'Brien's 1998-99 conduct involving Radojevic on May 14, 2004, when OSU self-reported. Therefore, even though the four-year statute of limitations had already expired, the NCAA could obtain a one-year extension of time for enforcement if it notified OSU by May 14, 2005. On May 13, 2005, the NCAA enforcement staff placed its notice to OSU in a Federal Express package for delivery to OSU, and OSU received the notice on May 16, 2005.
 {¶ 104} In its April 2007 report, the NCAA concluded that the NCAA enforcement staff's notice to OSU was untimely because the staff did not "submit" the notice until OSU received it, and OSU received it on May 16, 2005, two days beyond the deadline. Because of this late submission, the NCAA did not get the benefit of the one-year extension of time, the four-year statute of limitations applied, and it barred the NCAA from taking action on the 1998-99 violations involving Radojevic. As a result, the NCAA reversed some of its April 2006 report and remanded the matter back to the NCAA Committee on Infractions to reconsider an appropriate penalty. *Page 55 
 {¶ 105} Returning to the contract, in O'Brien's view, Section 5.1(b) is the exclusive means by which OSU could terminate him for conduct related to NCAA violations, and all of the criteria found in Section 5.1(b) must apply in order for "cause" to arise. As applied here, even though the NCAA conducted a "major" infractions investigation and the NCAA found significant violations — two prerequisites for termination under 5.1(b) — OSU still would have no power to terminate O'Brien for cause if a procedural bar (like the statute of limitations) precluded the NCAA from imposing one or more of the sanctions identified in 5.1(b)(i) through (vi). I agree with OSU that this view of the contract is untenable.
 {¶ 106} First, such a reading elevates the importance of NCAA action, or even inaction, above the commission of clear and obvious NCAA violations, a reading in conflict with the numerous contract provisions requiring the coach to know, enforce, and comply with NCAA rules. Second, it would allow a coach to hide possible violations until a time beyond the statute of limitations and then avoid termination, a result in conflict with the contract's requirements for immediate disclosure of known or suspected violations.
 {¶ 107} For these reasons, in my view, the trial court correctly concluded that subsections (a) and (b) of Section 5.1 have independent meaning and are not mutually exclusive. Therefore, the contract did not preclude OSU from terminating O'Brien for cause under 5.1(a), even though the alleged breach related to NCAA violations.
 {¶ 108} Next, unlike the majority, I conclude that Section 5.1(a) allowed OSU to terminate O'Brien for cause because O'Brien materially breached his contract with OSU. *Page 56 
In framing this issue, it is important to recall the trial court's finding that O'Brien breached the contract. Specifically, the court found:
 [O'Brien's] words and conduct are not those of a person who was sure that Radojevic would never play college basketball. Indeed, [O'Brien] acknowledged on cross-examination that if Radojevic had been reinstated, he would not have been eligible to play because of the loan [O'Brien] made to his family. [O'Brien] testified that he would have had to reveal the loan if reinstatement had been granted.
 In consideration of all of the evidence presented, the court finds that in December 1998 [O'Brien] had reasonable grounds to believe that he had violated NCAA Recruiting Bylaw 13.02.1 by making a loan to the family of Alex Radojevic. [O'Brien's] conduct in making the loan and then failing to report it to the director was a breach of Section 4.1(d) of the contract.
(Feb. 15, 2006 Decision ["Decision"] at 22.)
 {¶ 109} Having determined that a breach occurred, the court proceeded to determine whether that breach was material, a result that would discharge OSU from its obligation to pay under the contract. A breach of a portion of the terms of a contract does not discharge the obligations of the parties, unless performance of the breached terms is "essential to the purpose of the agreement." Kersh v. Montgomery DevelopmentalCtr. (1987), 35 Ohio App.3d 61, 62.
 {¶ 110} Ohio courts have held that the question whether a breach is material is primarily a question of fact. Unifirst Corp. v. M J Welding Machine, Inc. (Sept. 27, 1996), Scioto App. No. 95CA2401; Cent. TrustCo. v. Fleet Natl. Bank (May 11, 1994),
Hamilton App. No. C-930162. While I agree with the majority that an appellate court *Page 57 
generally must defer to a trial court's findings of fact, we need not always affirm them, nor should we affirm them blindly. Instead, where no competent, credible evidence supports the trial court's findings, we may conclude that those findings — even as to whether a breach was material — are against the weight of the evidence and reverse them on that basis. See, e.g., Kersh at 62-63 (reversing trial court decision on grounds that breach was not material); Kichler's, Inc. v. Persinger (1970), 24 Ohio App.2d 124 (reversing trial court's finding that breach was not material); Boehl v. Maidens (1956), 102 Ohio App. 211 (reversing trial court's finding that breach was material).
 {¶ 111} We have previously applied the Restatement of the Law 2d, Contracts (1981) 237, Section 241 when determining whether a breach is material. See Shanker v. Columbus Warehouse Ltd. Partnership (June 6, 2000), Franklin App. No. 99AP-772; Software Clearing House, Inc. v.Intrak, Inc. (1990), 66 Ohio App.3d 163, 170; Kersh at 62. Accordingly, in determining whether O'Brien's breach was material, we consider the following:
 (a) the extent to which OSU will be deprived of the benefit it reasonably expected;
 (b) the extent to which OSU can be adequately compensated for that lost benefit;
 (c) the extent to which O'Brien will suffer forfeiture;
 (d) the likelihood that O'Brien will cure his failure; and
 (e) the extent to which O'Brien's behavior comports with standards of good faith and fair dealing. *Page 58 
 {¶ 112} As to the first factor — the extent to which OSU will be deprived of the benefit it reasonably expected — the trial court looked to Section 4.1(d) of the contract and found that OSU reasonably expected O'Brien "to refrain from violating NCAA rules, to monitor assistant coaches and players to assure their compliance with those rules, to exercise a reasonable degree of vigilance to uncover any violations, and to immediately report any suspected violations." (Decision at 25-26.) The court rejected OSU's argument that O'Brien's breach deprived it of these benefits when he subjected OSU to NCAA sanctions, adversely affected OSU's reputation in the community, and breached the trust between O'Brien and Athletic Director Andy Geiger. However, I disagree with the manner in which the court defined the "benefit" OSU "reasonably expected" from its contract with O'Brien and, therefore, the conclusions the court drew regarding whether O'Brien's breach "deprived" OSU of that benefit. (Decision at 26.)
 {¶ 113} Specifically, in determining the extent to which OSU would be deprived of the benefit it reasonably expected, the court limited the expected benefit to the interests reflected in Section 4.1(d) of the contract, which required O'Brien to comply with NCAA rules and report any suspected violations. Section 4.1(d) imposed wide-ranging duties upon O'Brien to ensure not only that he would abide by university, Big Ten, and NCAA rules and policies, but also that he would ensure compliance by everyone around him, including the assistant coach to whom he entrusted the $6,000 in cash. It also required him not only to report violations, but also to report actual or suspected past or present violations by any person or entity, whether associated with OSU or not, presumably *Page 59 
including individuals who might seek financial incentives on behalf of a young player or his family. But even beyond this broadly defined expectation of NCAA compliance, the contract encompassed additional expectations, three of which are particularly important to our analysis here.
 {¶ 114} First, it goes without saying that OSU expected O'Brien to produce winning seasons, and numerous sections throughout the contract reflect that interest. The contract does not reflect an interest in winning at all costs, however. Section 4.0, which defines O'Brien's "Specific Duties and Responsibilities," required O'Brien, at Section 4.1(b), to "[d]evelop and implement programs and procedures with respect to the evaluation, recruitment, training, and coaching of Team members to compete successfully while assuring their welfare[.]" At a minimum, this section reflects an expectation that O'Brien would engage in recruiting activities that not only ensured success, but also assured the welfare of the basketball program as a whole.
 {¶ 115} Second, the contract reflects OSU's expectation that O'Brien would carry out his duties in full cooperation with the athletic director and the compliance office of the athletic department. Section 1.2 of the contract establishes the reporting relationship between the coach and the athletic director, and it provides that the coach must confer with the director or the director's designee "on all administrative and technical matters." References to this relationship occur throughout the contract. See, e.g., Sections 4.1(b), 4.1(d), 4.4, 4.6, 4.7, and 4.8. *Page 60 
 {¶ 116} Third, the contract reflects OSU's expectation that O'Brien would guard the university's reputation carefully, even as O'Brien acknowledged, by signing the contract, "that the local and national media interest in the Team and the men's basketball program in general is extremely high." Contract at 4.3. Pursuant to Section 1.4 of the contract, O'Brien "agree[d] to represent Ohio State positively in public and private forums" and agreed not to "engage in conduct that reflects adversely on Ohio State or its athletic programs." Pursuant to Section 4.2, he agreed not to undertake any "professional or personal activities or pursuits * * * that, in the opinion of Ohio State, would reflect adversely upon Ohio State or its athletic programs." And, pursuant to Section 4.4, he agreed not to participate in business transactions, product endorsements or media appearances that "may discredit or bring undue criticism to Ohio State."
 {¶ 117} Given these additional contract provisions, the trial court should not have limited its material breach analysis to OSU's expectation of NCAA compliance. Rather, in addition to that and other benefits, OSU reasonably expected competitive teams based on a compliant program, full cooperation with its athletic director and compliance office, and protection of its reputation and interests. Having defined OSU's expected benefits, I turn to the question whether, or to what extent, O'Brien's breach deprived OSU of these benefits.
 {¶ 118} As to possible sanctions against OSU, the trial court concluded that any NCAA sanctions may not be attributable solely to matters related to Radojevic and, in any event, the statute of limitations might preclude NCAA sanctions altogether. The court *Page 61 
also concluded that OSU's self-imposed sanctions — the post-season ban for the 2004-2005 season and forfeiture of two scholarships for the 2005 recruiting class — were not "as debilitating to [OSU's] basketball program as [OSU] suggests." (Decision at 27.) While one could certainly argue that OSU would have been even more successful without the sanctions, I cannot conclude that the trial court erred in making these findings. But more important for our analysis here, and tying these findings back to OSU's expectations under the contract, the threatened or actual sanctions did not significantly deprive OSU of the competitive teams it expected.
 {¶ 119} As to the adverse impact on OSU's reputation, the trial court concluded that it should not consider this alleged adverse effect because Section 5.1(c), as quoted above, allowed OSU to terminate O'Brien for criminal conduct or for "other improper conduct that, in Ohio State's reasonable judgment, reflects adversely on Ohio State or its athletic programs." Instead, the court concluded that, if this harm to reputation were a factor in O'Brien's termination, OSU would have cited Section 5.1(c) in its termination letter.
 {¶ 120} Nevertheless, the trial court stated further that, even if it were to consider the adverse impact on OSU's reputation, "it is clear to the court that the harm is not as great as [OSU] believes it to be." (Decision at 29.) In reaching this conclusion, the trial court considered that some of the harm resulted from other allegations relating to the basketball program, not just from those relating to Radojevic alone. In addition, the trial *Page 62 
court considered testimony that "an NCAA investigation is not unexpected" in an athletic program as large as OSU's. Id. at 30.
 {¶ 121} In my view, the court's legal conclusion that it should not consider the adverse impact on OSU's reputation was in error. As discussed above, Section 5.1(a), (b), and (c) provide independent grounds for terminating O'Brien. The fact that OSU chose to rely on Section 5.1(a), and not Section 5.1(c), in its termination letter has no bearing on whether OSU was deprived of a benefit it reasonably expected for purposes of determining whether O'Brien's breach was material.
 {¶ 122} More troubling, however, is the trial court's discussion of the alleged harm to OSU's reputation. In numerous contexts, courts have recognized the public interest and concern that surround a university's athletics programs, particularly if allegations of recruiting violations arise. In Barry v. Time, Inc. (N.D.Cal.1984), 584 F.Supp. 1110, a California federal court considered libel and slander claims brought by a former head basketball coach at the University of San Francisco. In doing so, the court had to decide whether the controversy surrounding alleged recruiting violations was a "public controversy." In the course of finding that a public controversy did exist, the court considered that the outcome of the controversy "could reasonably have been expected to have a significant impact on members of the [university] community, since the reputation of their university was at stake." Id. at 1116. "Furthermore," the court stated, "this controversy must be viewed in the context of the larger public debate over the proper role of athletic programs at institutions of higher learning." Id. at 1116-1117. *Page 63 
 {¶ 123} In Cottrell v. Natl. Collegiate Athletic Assn. (June 1, 2007), Case No. 1041858, 2007 Ala. LEXIS 104, the Supreme Court of Alabama similarly considered whether the NCAA and a sportswriter had defamed two football coaches from the University of Alabama in the course of an NCAA investigation into alleged recruiting violations. In the context of finding that a "public controversy" existed, the court considered the "widespread local and statewide media coverage" surrounding the NCAA investigation "as the media sought to unravel precisely what had happened that resulted in The University's being charged and found guilty of several rule violations." Id. at *61. The court also stated:
 Moreover, the citizens of Alabama had a legitimate interest in the controversy because The University is a public institution that receives State funds. The football program provides revenue for The University and, in light of the football program's tradition and history, is a source of pride for many of its graduates and the citizens of this State. Therefore, when "The University of Alabama football program was staring down the barrel of a gun" — facing potential termination of its football program — public discussion of all the circumstances creating the risk that the program could be terminated was rampant; a public controversy existed.
Id. at *61-62. See, also, Kneeland v. NCAA (W.D.Tex.1986),650 F.Supp. 1076, 1084, overturned on other grounds (C.A.5, 1988), 850 F.2d 224 (in determining whether NCAA investigatory records were subject to disclosure under state law, finding that the "public has a legitimate interest in knowing who recruits illegally, how these unscrupulous individuals operate, which institutions tolerate or encourage such activity, and what, if any, sanctions are imposed upon these individuals or institutions when *Page 64 
discovered"); Justice v. NCAA (D.C.Ariz. 1983), 577 F.Supp. 356, 372, fn. 13 (concluding that NCAA sanction rendering University of Arizona football team ineligible for post-season competition did not deprive plaintiff student-athletes of property interest in violation of due process rights, but acknowledging that "the sanctions carry with them a stigma and loss of prestige in the academic community that are of no small event").
 {¶ 124} To be sure, no amount of negative media attention will change the terms of a contract between consenting parties, and, to be clear, this is a case involving contract law, not defamation. But it is impossible to properly analyze whether O'Brien's breach deprived OSU of an expected benefit without at least acknowledging the seriousness of O'Brien's admission and the public scrutiny and criticism that necessarily follow an admission of this magnitude.
 {¶ 125} In determining that OSU did not suffer significant harm to its reputation, the trial court's discussion focuses on OSU's expectation and acceptance that NCAA investigations would occur within the basketball program, and that at least a portion of the investigation at issue here related to circumstances unrelated to Radojevic. But the trial court gives no consideration to the more significant harm, which arose, not from the investigation, but from the nature of O'Brien's own actions — his admission that he asked an assistant coach to transmit $6,000 in cash to the family of a player (whatever his official status) being recruited by OSU and other schools, that he participated fully in the university's attempts to reinstate that player immediately thereafter, that he told university and NCAA officials that he was unaware of any circumstances, other than prior *Page 65 
professional play, that would make the player ineligible, and that he did not disclose his actions until five years later, when it became clear that another source would reveal them. OSU should have expected, and clearly did expect, NCAA investigations, and even some violations, to occur within the contract period. See, e.g., Testimony of Heather Lyke, OSU Associate Athletic Director, Tr. at 620 (OSU reports "between 30 and 45" secondary violations to the NCAA annually). But this record contains no evidence that anyone at OSU expected O'Brien's blatant disregard for university, Big Ten, and NCAA ethical standards or the fundamental principles on which they are based.
 {¶ 126} NCAA member institutions share a common goal: maintaining intercollegiate athletics as an integral part of higher education. In order to meet this goal, universities must agree on common principles that protect the amateur character of college sports and ensure fair competition among participating schools. In the context of deciding the legality of an NCAA limitation on college football telecasts, inNCAA v. Bd. of Regents (1984), 468 U.S. 85, 101, the United States Supreme Court explained:
 * * * What the NCAA and its member institutions market in this case is competition itself — contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete. * * * *Page 66 
The United States Supreme Court agreed that the "interest in maintaining a competitive balance among amateur athletic teams is legitimate and important[,]" although it did not justify the broadcasting limitations at issue in the case. Id. at 117.
 {¶ 127} Indeed, before the trial court, one expert witness similarly explained the principle behind collegiate recruiting restrictions:
 * * * It's one that really goes through all of our rule making in regard to recruiting, and that is that we have a level playing field or competitive equity between institutions.
 * * *
 A. That is, you know, what we wrestle with consistently in the * * * proposed rules considering and in enacting rules, because unlike the professional ranks, we are not able to have a draft, and so a lot of our competitive equity between institutions depends significantly upon the fairness in recruiting between those institutions.
(Tr. at 979-980.)
 {¶ 128} Regardless of whether O'Brien violated an NCAA rule, his conduct strikes at the heart of these fundamental principles, principles that ensure fairness among competing schools and maintain amateur sports as an adjunct to higher education. As a result, as Andy Geiger explained:
 The reputation of the University has been irreparably harmed. The — the essence of intercollegiate athletic competition is to engage respectfully in competition with other universities, and we've — we've damaged that.
 I think alumni and members of the state of Ohio community, the adverse publicity nationally that the program has received has done damage that will take years to repair. *Page 67 
 This is a fundamental violation, and I think the breach is * * * very serious and the lack of — of — well, I just think that there has been enormous damage.
(Tr. at 789.)
 {¶ 129} Even O'Brien acknowledged the perception that would be created once his actions were revealed. OSU's counsel asked: "[W]hat on earth is the reason for not revealing the $6,000 payment?" (Tr. at 184.) O'Brien responded:
 A. Well, for exactly what is going on now. Because the whole idea, in my mind, was the perception of what could conceivably come from this gesture, and that's exactly what's been taking place.
 Q. The perception that you were paying money for a kid to come to your school?
 A. The perception because of words that I hear are payment, inducement, and none of that is accurate. It's for those reasons.
(Tr. at 184-185.)
 {¶ 130} O'Brien entered into the contract with an express understanding of OSU's position within the national spotlight. He did not just promise to comply with NCAA rules. He promised to protect the university's reputation and interests and to develop recruiting programs and procedures that assured the welfare of its team and program. Far from contracting away its reputation, OSU sought in many ways to protect its reputation and to guard against O'Brien harming it, and, in this respect, OSU got none of the benefit it expected from O'Brien's promises. *Page 68 
 {¶ 131} Finally, I find no evidence in this record to support the trial court's finding that "the loss of trust caused by [O'Brien's] failure of performance was not as profound and debilitating as [OSU] contends." (Decision at 33.) In coming to this conclusion, the court focused on the absence of an express contract provision regarding the trust that must exist between O'Brien and Geiger. As detailed above, however, the contract did contain provisions requiring cooperation and consultation between O'Brien and the athletic department, both for purposes of maintaining NCAA compliance and for other administrative purposes.
 {¶ 132} Geiger testified that, "gradually from April 24[th] [2004], as — as I worked with University officials on this issue, we all, I think, developed the feeling that this breach was so great that it would be impossible for us to carry forward our * * * men's basketball program with Coach O'Brien, and that our only recourse was termination." (Tr. at 786.) Geiger personally "viewed it as impossible to continue" his relationship with O'Brien. (Tr. at 787.) Geiger stated:
 A. That was my view. I — as I stated here in response to questions previously, our relationship, up until April 24th, 2004, going forward, had been a terrific relationship. I felt that Coach O'Brien did a terrific job for Ohio State. Clearly the record on the court was good. He did a wonderful job of straightening out a program that was in disarray when he took it over. He and I think had — I think had high regard for each other.
 I also think that Ohio State did its fair share. I think that the team had a wonderful place to play, a wonderful place to practice, very fine facilities across the board, a more than adequate budget, and a — and an operating environment *Page 69 
that was conducive to success, and we were paying the Coach handsomely for his work.
 And this behavior that we've been describing here this afternoon, is simply unconscionable in the face of the relationship that we had established, and to say nothing of the technicalities and the — and the language that was in our framework and that is his contract.
(Tr. at 787-788.)
 {¶ 133} While O'Brien presented evidence that a coach conceivably could continue to serve out a contract while an NCAA investigation was pending, and that other coaches had, O'Brien presented no evidence that OSU had the willingness or ability to trust him again. In the end, while the trial court may have discounted Geiger's testimony about whether he could have continued or repaired his relationship with O'Brien, the contract expressly provided for a close relationship between O'Brien and Geiger and between O'Brien and the athletic compliance office. Therefore, regardless of the weight the trial court ultimately gave Geiger's testimony, at a minimum, OSU did not receive the benefit it reasonably expected from those contract terms.
 {¶ 134} For all of these reasons, O'Brien's breach significantly deprived OSU of the benefits it reasonably expected from the contract, the first factor we must consider in determining whether O'Brien's breach was material. While O'Brien's conduct may not have significantly deprived OSU of its ability to recruit players and produce competitive teams, the conduct deprived OSU of the benefits of a compliant program, full cooperation *Page 70 
with its athletic director and compliance office, and protection of its reputation and interests.
 {¶ 135} In addition, OSU could not be adequately compensated for the losses it suffered, nor could O'Brien cure his breach, the second and fourth factors, respectively, for determining whether O'Brien's breach was material. As the trial court recognized, "with respect to the damage to [OSU's] reputation and any loss of trust that can be fairly attributed to this breach, [OSU] cannot be fully compensated." (Decision at 34.) And, "[a]ny negative perceptions of [OSU] that may arise from the public knowledge of [O'Brien's actions] cannot be nullified." Id. at 35.
 {¶ 136} Despite these findings, the trial court concluded that the loss of trust between Geiger and O'Brien was nevertheless "curable." Id. The trial court noted Geiger's testimony that O'Brien's loan to Radojevic's family was a "noble act" and Geiger's admission "that, other than [O'Brien's] conduct in the Radojevic matter, [O'Brien's] overall performance of the contract had been excellent." Id. at 35. That is akin to saying that, other than O'Brien's flagrant disregard for the fundamental principles of fair competition in college sports, his overall performance had been excellent. It simply ignores the most important fact.
 {¶ 137} In the end, the trial court concluded that any loss to OSU did not outweigh the forfeiture O'Brien suffered (the third factor in the material breach analysis) or the relative good faith of the parties (the fifth factor). Instead, the trial court concluded that the parties did not consider O'Brien's "performance under Section 4.1(d) of the contract to *Page 71 
be so critical that a failure of any kind would justify immediate termination for cause. If [OSU] reasonably expected perfect compliance, Section 5.1(b) would not have been made part of the agreement." (Decision at 40.)
 {¶ 138} In this respect, the trial court appears to contradict its earlier legal conclusion that Section 5.1(b) did not preclude OSU from terminating O'Brien for cause under Section 5.1(a), even where a breach related to an NCAA violation. As explained above, however, as a matter of law, Section 5.1(a) provides independent grounds for O'Brien's termination, and Section 5.1(b) did not preclude OSU from terminating O'Brien here.
 {¶ 139} Furthermore, there is no evidence in this record and no provision in the contract to indicate that OSU "expected perfect compliance[.]" Instead, the evidence shows that OSU reports many violations to the NCAA annually and surely expected NCAA investigations during the contract period. But there is no evidence that OSU expected the wholesale disregard for compliance at issue here.
 {¶ 140} Lastly, I find no support for the trial court's characterization of O'Brien's conduct as a "single, isolated failure of performance[.]" (Decision at 42.) That characterization hardly describes the magnitude of O'Brien's actions and, again, misses the larger point that O'Brien's conduct violated, as Geiger put it, the "essence" of college sports. (Tr. at 789.) O'Brien gave $6,000 in cash to the family of a player he was recruiting. He lied about the player's status to OSU and the NCAA. And he only came clean when he had to. His actions are nothing less than shocking, and the repercussions *Page 72 
from them went well beyond a single concern for compliance with the technicalities of the contract or NCAA rules.
 {¶ 141} In the final analysis, the key to determining whether a breach is material is whether performance of the breached terms was "essential to the purpose of the agreement." Kersh at 62. While perfect compliance was not essential to the purpose of the agreement between O'Brien and OSU, minimal adherence to fundamental principles of fair competition certainly was. Without it, OSU lost the benefit of numerous aspects of its agreement with O'Brien: compliance with, and assurance of, NCAA, Big Ten, and university rules and standards; competitive teams based on a compliant program; recruiting procedures that assured the welfare of the team and the men's basketball program; a trusting relationship with its athletic director and compliance office; and the protection of its reputation and interests. Therefore, O'Brien's breach was material, and OSU had good grounds to terminate him.
 {¶ 142} For these reasons, I would sustain the first assignment of error. I would not reach OSU's second assignment of error or O'Brien's cross-appeal. Having concluded that the trial court erred in entering judgment for O'Brien, I would reverse the judgment of the trial court and enter judgment in favor of OSU. *Page 1