**SOFTWARE CLEARING HOUSE, INC., Appellee and Cross–Appellant,**

v.

**INTRAK, INC., Appellant and Cross–Appellee.**

[Cite as *Software Clearing House, Inc. v. Intrak, Inc.* (1990), 66 Ohio App.3d 163.]

Court of Appeals of Ohio,
Hamilton County.

Nos. C–880469, C–880497.

Decided Feb. 14, 1990.

*Keating, Muething & Klekamp, Kevin E. Irwin* and *Robert A. Klingler,* for appellee and cross-appellant.

*Frost & Jacobs, Michael F. Haverkamp* and *Douglas E. Hart,* for appellant and cross-appellee.

*Per Curiam.*

These appeals arise from an action in which the complaint of Software Clearing House, Inc. ("SCH") and the counterclaim of Intrak, Inc. ("Intrak") each sought relief for breach of contract. Under the trial court's judgment, SCH was awarded $193,900.48 on its complaint, including $32,941.75 in prejudgment interest, after its damages in the amount of $359,907.49 were offset by the $166,007.01 awarded to Intrak on its counterclaim. Intrak raises several issues in its appeal, including whether the manifest weight of the evidence shows, contrary to the trial court's finding, that SCH's breaches were material. Intrak also challenges the trial court's enforcement of an oral modification of the written contract, the award of prejudgment interest and the exclusion of testimony relating to admissions of unreported sales by foreign agents and to the parties' intent concerning competition after termination of the contract. SCH claims in its cross-appeal that the trial court

erred by awarding Intrak money for sales by SCH's foreign agent for which SCH did not receive payment, and for maintenance fees billed to, but not paid by, foreign customers. We find no error in the trial court's judgment except with respect to its award of prejudgment interest and its assessment of Intrak's offsetting damages.

Intrak is a developer and supplier of computer software products that, in 1980, entered into a series of exclusive sales contracts with SCH, a company that markets software products. The contracts provided for domestic marketing, sales and distribution of several of Intrak's products. The contracts also provided for the rental of Intrak's products and the provision of continued maintenance to customers located by SCH. One year later, the parties entered into another series of similar agreements in which SCH agreed to establish and manage an international marketing, sales and distribution network for the same Intrak products.

The contracts provided that Intrak was to receive sixty-five percent of the U.S. sales price for each sale, and that SCH was to receive the remaining thirty-five percent. Foreign agents were permitted to determine their own sales prices, provided that they paid SCH one hundred percent of the U.S. sales price as the "transfer fee." SCH was, in turn, to remit sixty-five percent of the transfer fee to Intrak. Intrak was responsible for collections on domestic sales, however, and paid SCH its thirty-five percent share of sales out of the proceeds.

Before entering into the contracts, the parties considered the potential windfall that might accrue to Intrak if it terminated the contracts after the development of a substantial customer base and thereby avoided paying commissions on subsequent but inevitable sales of its products. In order to avoid that possibility, the parties agreed to a "traildown" clause in which Intrak agreed to pay SCH a gradually decreasing commission on sales made over a period of twelve months following termination. Although the contracts expressly prohibited SCH's sale of other products in direct competition with Intrak's products, they did not expressly define the duration of the competitive bar or whether it applied to the twelve-month "traildown" period.

The parties were successful in achieving a rapid growth in sales, at least with respect to the domestic market. Foreign sales agents complained, however, that the transfer fee, equal to the U.S. sales price, was excessive. Following a trade convention in 1982 attended both by Intrak and by SCH and some of its foreign sales agents, the parties orally agreed to permit the foreign agents to keep all but eighty percent of the U.S. sales price, which would then be paid to SCH and split between SCH and Intrak according to the previously agreed percentages. This modification was followed until 1983,

when the parties further agreed to provide foreign agents an optional pricing structure under which the agent was permitted to retain forty percent of gross sales revenues and remit the remaining proceeds to SCH, to be divided as before.

Problems with the parties' relationship began developing in the spring of 1984, when one of SCH's foreign agents, RX Computers, Ltd. ("RX"), began experiencing difficulty meeting sales quotas and performance standards. SCH eventually terminated RX as its agent in the summer of 1984, and shortly thereafter discovered that RX had been making unauthorized "rogue" sales and keeping all the proceeds for itself. SCH wrote a letter to Intrak dated September 14, 1987, enclosing payment for Intrak's share of profits which would have accrued from the rogue sales during the term of RX's agency. The letter further stated, "As we obtain evidence of other payments of RX, we will forward these monies as well." Although RX continued to make unauthorized sales of Intrak software after its termination by SCH, no further payments were made by SCH to Intrak. In November 1984, Intrak began "deferring" payments of commissions due SCH for domestic sales, ostensibly for the purpose of compensating itself for the additional rogue sales by RX.

Shortly after terminating RX as its agent, SCH began to establish its own international telemarketing operation directed largely to the region previously served by RX, England and France. SCH paid Intrak sixty-five percent of U.S. list price for such sales, which represented a change from its previous practice of paying Intrak sixty-five percent of the gross sales price for the small number of direct, international sales it made before RX was terminated. This practice, referred to by Intrak as "double dipping," effectively resulted in SCH receiving the share of proceeds otherwise retained by the foreign agent, in addition to its usual thirty-five percent share.

In February 1985, Intrak sent SCH a notice of termination concerning two of its less successful products, NAVIGATOR and FLAWCHECK, while maintaining its two most successful agreements for products called DATFAST and TOPICS. SCH initially filed suit seeking a declaratory judgment and an accounting. Intrak formally terminated the remaining DATFAST and TOPICS contracts on June 27, 1985, and refused to make any payments pursuant to the "traildown" clause or to refund any amounts it had previously withheld. SCH began withholding funds due Intrak from international sales on July 1, 1985. In order to protect its customer base after termination SCH began offering its customers "tradeouts" of similar, competing products for a nominal fee. The day the trial began, the parties stipulated to the amounts due the other in the event the trial court determined the various underlying

issues of liability, including the amounts withheld by each side, the amount due under the "traildown" provision, the amount due from the oral modifications of the contracts and changes in pricing structure, including SCH's "double-dipping" practices, and the amounts due from rogue sales and other maintenance fees billed by RX.

Intrak's first three assignments of error are addressed essentially to the same proposition: that the trial court's finding that SCH's breaches of contract were not material and did not excuse Intrak's performance under the "traildown" clause was against the manifest weight of the evidence.[1]

Intrak's fourth assignment of error, that the trial court erred in not granting its motion to dismiss at the close of SCH's case, also is founded on a question of the manifest weight of evidence, and shall accordingly be addressed with the first three assignments. See *Janell, Inc. v. Woods* (1980), 70 Ohio App.2d 216, 24 O.O.3d 266, 435 N.E.2d 1138.

In a civil case, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. We have carefully reviewed the record, and have found there to be competent and credible evidence supporting the trial court's finding that SCH's breaches were not material and did not excuse Intrak from performing under the "traildown" clause. A breach of a portion of the terms of a contract does not discharge the obligations of the parties to the contract, unless performance of those terms is essential to the purpose of the agreement. *Kersh v. Montgomery Developmental Ctr.* (1987), 35 Ohio App.3d 61, 519 N.E.2d 665; *Boehl v. Maidens* (1956), 102 Ohio App. 211, 2 O.O.2d 204, 139 N.E.2d 645. As noted in *Kersh*, the Restatement of the Law 2d, Contracts sets forth five factors to be used to determine the materiality of a breach, including the extent to which the injured party will be deprived of the expected benefit, the extent to which the injured party can be adequately compensated for the lost benefit, the extent to which the breaching party will suffer a forfeiture, the likelihood that the breaching party will cure its breach under the circumstances, and the extent to which the breaching party has

---

1. Intrak's first three assignments of error are as follows:
    1. The trial court erred in granting SCH judgment on its claim relating to the traildown provision in the parties' contracts.
    2. The trial court erred in its finding of fact 16(c) that SCH made reasonable efforts to organize and control its foreign agents.
    3. The trial court erred in its finding that SCH's breaches of its contractual duties were not material.

acted with good faith and dealt fairly with the injured party. *Kersh, supra,* 35 Ohio App.3d at 62–63, 519 N.E.2d at 668, quoting Restatement of the Law 2d, Contracts (1981) 237, Section 241.

The benefits SCH obligated itself to provide Intrak under the sales agreements were largely the establishment and management of domestic and international sales, including the organization of foreign sales agencies, and the billing and collection of the foreign accounts. Competent and credible evidence was adduced at trial to demonstrate that Intrak received substantially all to which it was entitled. For example, SCH's sales efforts resulted in an annual sales volume in excess of $1,200,000 for the DATFAST and TOPICS products during the final year of the contracts. Damages from the breaches awarded by the trial court and claimed by Intrak to be material were stipulated by the parties to amount to approximately $38,300.[2] If the breaches claimed by Intrak were held to be material breaches, SCH would forfeit its right to collect any portion of the $175,620.99 due it under the "traildown" clause. The record also contains a substantial amount of evidence that SCH endeavored to remedy what it perceived to be its own shortcomings and to perform the contract in good faith and in accordance with standards of fair dealing, including its gratuitous payment of Intrak's share of proceeds on illicit sales by its foreign agent, RX. We are therefore unable to say that the trial court's findings were against the manifest weight of the evidence. In view of our determination that the trial court's findings were not against the manifest weight of the evidence, we also cannot say that the trial court abused its discretion in overruling Intrak's motion to dismiss at the close of plaintiff's case. Accordingly, we overrule Intrak's first four assignments of error.

Intrak's fifth and sixth assignments of error are addressed to the oral modification of the relative percentages of compensation received by the parties from sales by foreign agents. Intrak argues that the modifications are unenforceable because it received no consideration for a change in terms which merely excused SCH from fully performing its duties. Whether this argument could validly have been made at the time the changes were sought by SCH is not now controlling, however, after the parties have acted upon the changes and continued their performance over several years. A gratuitous oral agreement to modify a prior written agreement is binding if it is acted upon by the parties and if a refusal to enforce the modification would result in a fraud or injury to the promisee. *Mehurin v. Stone* (1881), 37 Ohio St. 49;

---

2. Of the breaches determined by the trial court in favor of Intrak, the breaches we find to have been properly awarded amount to only approximately $7,200.

*Paramount Supply Co. v. Sherlin Corp.* (1984), 16 Ohio App.3d 176, 16 OBR 186, 475 N.E.2d 197. Subsequent acts and agreements may modify the terms of a contract, and, unless otherwise specified,[3] neither consideration nor a writing is necessary. *Morrison v. DeVore Trucking, Inc.* (1980), 68 Ohio App.2d 140, 22 O.O.3d 252, 428 N.E.2d 438; R.C. 1302.12. We therefore find Intrak's fifth and sixth assignments of error not to be well taken.

Intrak's seventh and eighth assignments of error challenge the trial court's award of prejudgment interest to SCH, and claim that the trial court erred in holding that the amounts due were liquidated and therefore amenable to an award of prejudgment interest. We agree. A creditor is entitled to prejudgment interest under R.C. 1343.03(A) "when money becomes due and payable" upon the underlying obligation. Prejudgment interest consistently has been held to be properly awarded only where the amount owed under a contract is clear and certain, or is at all times capable of mathematical calculation by application of a formula. *Physician's Services, Inc. v. Willoughby* (1987), 37 Ohio App.3d 130, 524 N.E.2d 515; *Nursing Staff of Cincinnati, Inc. v. Sherman* (1984), 13 Ohio App.3d 328, 13 OBR 406, 469 N.E.2d 1031; *Tony Zumbo & Son Constr. Co. v. Dept. of Transp.* (1984), 22 Ohio App.3d 141, 22 OBR 381, 490 N.E.2d 621. The interest on such debt runs from the time it becomes due and payable. *Horning–Wright Co. v. Great American Ins. Co.* (1985), 27 Ohio App.3d 261, 27 OBR 261, 500 N.E.2d 890.

In the instant case, SCH was not due its commission for a sale until Intrak was paid by the individual customer.[4] Because this dispute involved thousands of invoices and payments, SCH assumed, based on its survey of a sample of the invoices and payments, that payment was made by a customer on an average of ninety days from the invoice or due date. The ninety-day average was disputed by Intrak at trial, but adopted by the trial court. The record before us contains no evidence of when the payments were actually received for each invoice. Therefore, we find that the amount due SCH was not shown to be sufficiently clear or subject to mathematical calculation to permit an award of prejudgment interest. See *M.B. Simpson, Inc. v. Globe Corp.* (Dec. 29, 1982), Hamilton App. Nos. C–810691, C–810738, unreported, 1982 WL 9268. Accordingly, Intrak's seventh and eighth assignments of error are well taken.

---

**3.** The contracts contain no requirement that subsequent modifications be in writing.

**4.** The parties' intent to make payment of the other's proceeds conditional upon collection from the ultimate customer is discussed in SCH's first and second assignments of error, below.

Intrak's ninth assignment of error is addressed to the trial court's exclusion from evidence of statements allegedly made by SCH's foreign agents claiming to have made unauthorized sales. The statements were excluded by the trial court as hearsay that was neither an admission of a party-opponent under Evid.R. 801(D)(2) nor a statement against interest under Evid.R. 804(B)(3). We find no error in the trial court's ruling.

Evid.R. 801(D)(2) provides that a statement is not hearsay if it is "offered against a party and is * * * (d) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship * * *." The statements of the foreign agents sought to be admitted in the instant case do not fall within the scope of their employment with SCH because they concerned unauthorized acts made solely for their own benefit and in departure from the purpose of their agency. Therefore, the statements were not admissible under Evid.R. 801(D)(2). See *Worthington v. Cleveland City Ry.* (1904), 9 Ohio C.C. (N.S.) 433, affirmed without opinion (1907), 75 Ohio St. 626, 80 N.E. 1135; *Finley v. Schuett* (1982), 8 Ohio App.3d 38, 8 OBR 41, 455 N.E.2d 1324.

The hearsay exception under Evid.R. 804(A)(5) is also unavailable to Intrak because no showing was made at trial that the declarant was unavailable. Intrak's assertion that SCH waived the requirement of showing unavailability by failing to object at trial is groundless. The burden of establishing unavailability rests on the party offering the evidence. *State v. Smith* (1979), 58 Ohio St.2d 344, 12 O.O.3d 313, 390 N.E.2d 778, vacated on other grounds (1980), 448 U.S. 902, 100 S.Ct. 3041, 65 L.Ed.2d 1132; *State v. Riggins* (1986), 35 Ohio App.3d 1, 519 N.E.2d 397. The record reflects that no such showing was made. Accordingly, we overrule Intrak's ninth assignment of error.

Intrak's tenth assignment of error challenges the trial court's evidentiary ruling which excluded parol evidence of whether the parties intended to permit SCH to sell competing products during the "traildown" period. A related issue is raised in Intrak's eleventh assignment of error, that the trial court erred by finding that the parties intended to permit SCH to compete during the "traildown" period, after it excluded evidence of intent on that issue. We find neither assignment to be well taken.

Assuming, for purposes of argument only, that the trial court erred in excluding the testimony of Intrak's president and chairman of the board, Ron Manning, we conclude that the testimony proffered by Intrak shows the error to be harmless. Although Intrak contests the trial court's ruling on the ground that it prevented Intrak from proving that the parties intended to prohibit competition during the "traildown" period, the proffered testimony

indicates only that SCH president William Ivers agreed with Manning to continue to market and sell Intrak's products until the ninth or tenth month of the "traildown" period.[5] We find that the error of the trial court, if any, did not affect the substantial rights at the parties, and accordingly, we cannot reverse the judgment of the trial court on such grounds. Civ.R. 61; *Leichtamer v. American Motors Corp.* (1981), 67 Ohio St.2d 456, 21 O.O.3d 285, 424 N.E.2d 568.

In its separately filed appeal, SCH challenges, first, the trial court's award of $16,447.87 in damages to Intrak for sums collected by its foreign agent, RX, but not received by SCH and, second, the award of $14,594.78 in damages for maintenance fees billed to foreign customers but not collected by SCH. Both assignments will be addressed together to the extent they involve the common question of SCH's obligation to pay Intrak for foreign sales billed but not yet collected by SCH. The contracts in question provided in paragraph six that:

"SCH shall fulfill the following obligations and responsibilities:

"(a) To perform all tasks required to promote, publicize, distribute, sell, and when sold in foreign countries collect payments for the product.  * * *

" * * *

"(f) To invoice and collect payments for the Product when sold in foreign countries. *Upon receipt of payments from the customer or SCH's Agents, SCH shall forward the payment,* less the appropriate commission, to the supplier within five (5) business days.  * * * " (Emphasis added.)

SCH's proposed findings of fact and conclusions of law, adopted by the trial court in their entirety, do not contain a finding that SCH breached its

---

5.  The following testimony of Manning was proffered:
   "THE WITNESS: Well, before we signed this, we certainly went over each one of the items in there and we discussed what this was, what it represented, what it meant, and how it was to operate, and how we were going to operate under that.
   "And under Paragraph 11, the agreement between the two parties was that the language here means that, as Mr. Ivers explained it to me, he said at some point in time, he said, we're small companies now but as we grow, he says, at some point in time you're going to be successful enough that you're going to want to have your own marketing force.
   "He says, and at that particular time when we terminate the arrangement, then he would continue to market and sell the product until such time it was not feasible for him to do so, which would be somewhere around the ninth or tenth month, at which time as they are coming down, our marketing force would be building up and should be effective and able to take over those sales.
   "MR. HAVERKAMP: They being your marketing force?
   "THE WITNESS: Yes.
   "THE COURT: Was that the end of the proffer?
   "MR. HAVERKAMP: I think that's enough for the proffer, your Honor."

contractual duty to collect foreign payments, despite its failure to obtain payment for the illicit RX sales or for the maintenance charges billed to certain RX customers by SCH. Instead, the applicable finding of fact merely recites that certain customers were billed but that no one was paid for the charges.

A review of the record also fails to disclose any evidence that the parties intended SCH to guarantee collection of the foreign invoices. In fact, the practice of the parties, in which payment of commissions to either side was not made until payment was received from the customer, indicates that no such guarantee was intended. This conclusion is in accordance with the language of the contract, which makes payment by SCH conditional "[u]pon receipt of payments from the customer or SCH's Agents * * *." Although the record contains evidence that SCH was not paid on certain amounts, it contains no evidence demonstrating that SCH's collection efforts were insufficient. We therefore find, with respect to the award of foreign maintenance payments challenged in SCH's second assignment of error, that the trial court erred as a matter of law in concluding that SCH owed Intrak maintenance fees "because of its direct billing of these customers." See *State, ex rel. Squire, v. Cleveland* (1948), 150 Ohio St. 303, 345, 38 O.O. 161, 177, 82 N.E.2d 709, 729.

An alternative ground is asserted by Intrak as justifying the award of damages challenged in SCH's first assignment of error, namely, that SCH made an additional promise in its letter of September 14, 1984, to pay Intrak its percentage for RX's illicit sales. SCH claims that the promise is unsupported by either consideration or part performance. We agree with SCH's contention.

Although the complete absence of consideration from a contract is sufficient to permit its cancellation, once the presence of such consideration is shown, a court will not inquire into the adequacy of the consideration except in cases of fraud or unfair treatment. Valuable consideration may consist of either a detriment to the promisee or a benefit to the promisor. *Mooney v. Green* (1982), 4 Ohio App.3d 175, 4 OBR 276, 446 N.E.2d 1135.

At trial, Intrak argued that SCH received consideration for its promise to pay Intrak's share on illicit sales made by RX, even after RX's agency with SCH was terminated, by its receipt from Intrak of reports of additional illicit sales made by RX. Although this information might have benefitted SCH by offsetting claims asserted by RX against it in litigation before a federal district court, the settlement contemplated by the litigation was never consummated, and RX has not performed under the agreement. Intrak also claims that it undertook at least a slight detriment by forwarding

the previously obtained information to SCH. It appears from the record that the information given SCH had already been obtained by Intrak at the time the letter was received. More important, the letter does not make payment for the additional RX sales conditional on receipt of Intrak's correspondence with RX, but merely makes an additional request to that effect, in addition to its gratuitous promise to pay for the sales.[6] The mere utterance of a promise does not supply the actual consideration for the bargain. Rather, "[i]t is the content of the promise or the actual anticipated performance which supplies consideration for the bargain." *Coca–Cola Bottling Corp. v. Kosydar* (1975), 43 Ohio St.2d 186, 193, 72 O.O.2d 104, 108, 331 N.E.2d 440, 444.

■■■ Intrak also urges that SCH partly performed its promise to reimburse it for the RX sales by paying for illicit sales made during the term of RX's agency. Intrak argues that SCH should therefore be bound to pay for the subsequent sales to the same extent that part performance resulted in the binding price modifications made to the contract, as discussed in Intrak's fifth and sixth assignments of error, above. Intrak's argument confuses the rule that consideration is necessary to form and support a contract, with the issue of the requisite consideration for modification of a contract once it has been formed. Because consideration was lacking for SCH's promise to reimburse Intrak for the illicit sales, there was no existing contract to be modified by SCH's part performance, if, indeed, such part performance could be argued to make the remaining portion of SCH's promise binding. See *Johnson v. Otterbein Univ.* (1885), 41 Ohio St. 527.

Because no performance by Intrak was anticipated by SCH's promise, and because no consideration flowed between the parties, we hold SCH's first assignment of error relative to the rogue sales made by RX after its termination by SCH to be well taken.

The judgment of the trial court is therefore affirmed in part and reversed in part, and this case is remanded with instructions to vacate the award of prejudgment interest and to modify the $166,007.01 in damages awarded to Intrak by reducing them by $31,042.65, in accordance with SCH's first and second assignments of error and the law and this decision.

*Judgment accordingly.*

SHANNON, P.J., UTZ and GORMAN, JJ., concur.

---

6. The letter states, in pertinent part:
   "Please find enclosed a detailed listing of amounts paid Rx which they are holding. We currently have proof of payment to Rx for these amounts and hence enclose a check for $14,417. As we obtain evidence of other payments to Rx, we will forward these monies as well. We request that you send us your September 3rd correspondence from Rx for comparison with our records."