In re CINCINNATI ENTERTAINMENT ASSOCIATES, LTD., et al., Debtors.

Hamilton County Board of County Commissioners, Claimant,

v.

Cincinnati Entertainment Associates, Ltd., et al., Debtors.

No. 01–11620.

United States Bankruptcy Court, S.D. Ohio, Western Division.

Nov. 28, 2001.

*see* Docs. 26, 28, is also DENIED for that reason.

854

Timothy J. Hurley, Mary A. DeFalaise, Cincinnati, OH, for debtors.

Christian J. Schaefer, Roger E. Friedmann, Cincinnati, OH, for Hamilton County, Board of County Commissioners.

Henry E. Menninger, Jr., Clifford Craig, Cincinnati, OH, for UCC.

## DECISION RE CLAIMANT'S CURE CLAIM

BURTON PERLMAN, Bankruptcy Judge.

This matter arises in the jointly administered bankruptcy cases of Cincinnati Entertainment Associates, Ltd. (hereafter "CEA"), Cyclones Hockey Club, LP, and CEA Holdings, LLC (hereafter collectively "Debtors"). By order entered April 24, 2001, this court authorized the public auction sale of substantially all of Debtors' assets. In that order, provision also was made for the assumption and assignment of certain executory contracts or unexpired leases. In connection with such assumption and assignment, the court set a bar date of May 25, 2001 by which cure claims with respect to assumed executory contracts and/or leases were required to be filed. On May 22, 2001, the Hamilton County Board of County Commissioners (hereafter "Claimant"), timely filed a cure claim asserting that it is due the amount of $47,161.00 on account of a pre-petition default in a lease agreement running between itself and Debtors.

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(A) and (B).

We find the following facts. There are two sports arenas in the City of Cincinnati

located on the banks of the Ohio River. One is presently known as Cinergy Field and had been used for both the professional football and baseball teams of Cincinnati. The other, now known as Firstar Center, is located to the east of Cinergy Field. Prior to its sale in the present bankruptcy case, it was owned by CEA. The Firstar Center is an enclosed arena, housing a hockey team. Various concert and other special events are also held there. Cinergy Field is owned by Hamilton County, and includes extensive parking facilities on several levels. Until recently, Cinergy Field included a plaza level which was connected by a walkway directly to Firstar Center, providing access from parking at Cinergy Field to attendees at Firstar Center. The parking in this area of Cinergy Field parking was identified as Lot 6. The parking at Lot 6 was made available to the attendees at Firstar Center pursuant to a certain Lease Agreement. That Lease Agreement was dated January 1, 1974, and had been entered into between the City of Cincinnati and the Cincinnati Coliseum Company. In the course of time, the original parties to the Lease Agreement were replaced by Claimant in place of the City of Cincinnati (effective September 26, 1996), and Cincinnati Coliseum Company by CEA, one of the Debtors herein (dated February 10, 1987). The Lease Agreement by its terms related to construction of the new facility, now Firstar Center, and the making available for that stadium of existing parking facilities at what is now Cinergy Field. The Lease Agreement states that the leased parking facilities "are generally unused at the times" when Firstar Center would be in operation.

Of recent years it has been decided to upgrade the athletic facilities at the river front in Cincinnati. For that purpose, a new football stadium was built on the river front at some distance to the west of Cinergy Field. It has also been decided to build a new baseball stadium. This is being built in the space between Cinergy Field and Firstar Center. During the process of construction of the new baseball facility, baseball will continue to be played at Cinergy Field, but it has been necessary to remove a portion of the stands at Cinergy Field in order that construction of the baseball field may proceed. In addition to the demolition of a portion of Cinergy Field stands, that portion of the plaza level surrounding Cinergy Field has, together with the walkway to Firstar Center, been demolished. With this demolition, a significant portion of the parking at Cinergy Field, Lot 6, has disappeared. Prior to that demolition, however, Claimant built a new facility, the East Garage to the east of Firstar Center.

August 1, 2000, is a significant date for present purposes. By that date, construction of the East Garage had been completed and was ready for operation. With the availability of that parking, demolition and clearing of the site between Firstar Center and Cinergy Field commenced, to make way for construction of the new baseball stadium.

Prior to the construction and opening of the East Garage on August 1, 2000, for some years the handling of parking and the proceeds therefrom had occurred in what became a usual manner. This was in conformity with the terms of the Lease Agreement to which reference was made above. The Lease Agreement provided rental terms as follows:

(1) Twenty-five percent (25%) of the first $450,000 Arena Parking receipts during such lease year, plus

(2) Thirty-three and one-third percent (33–1/3%) of Arena Parking receipts during such lease year in excess of $450,000 but not more than $600,000, plus

(3) Thirty-seven and one-half percent (37–1/2%) of Arena Parking receipts during such lease year in excess of $600,000.

The Lease Agreement defines "Arena Parking receipts" as meaning gross receipts derived from charges for Arena Parking, excluding taxes. "Arena Parking" is itself defined at p. 4 of the Lease Agreement, as meaning "the parking of motor vehicles in the stadium Parking Facilities for Arena events." The county operated the parking facilities through a manager, Central Parking System. After each event at Firstar Center, Central Parking System would remit to CEA the amount due it from parking receipts in the amount prescribed by the Lease Agreement. Because parking for Firstar Center events occurred at a time when the parking facilities at Cinergy Field were "generally unused," it was a simple matter to calculate the amount due CEA for parking, for all receipts collected at the time of Firstar Center events were subject to distribution in accordance with the Lease Agreement formula. Central Parking would make payment to CEA for its share.

After August 1, 2000, it was not immediately apparent that the East Garage facility would be used by Debtors. The East Garage then not being in existence, of course, was not part of the specified parking facilities at the time the original Lease Agreement was entered into. The Lease Agreement also included a requirement that parking facilities operated by Claimant other than those specified in the Lease Agreement would not be open during events conducted by Debtors. The Lease Agreement had a provision for identifying replacement parking for the parking specified in the Lease Agreement. For its own reasons, Claimant was unwilling to utilize that procedure in connection with the East Garage, and East Garage was not designated as replacement parking in the manner contemplated by the terms of the Lease Agreement. Yet, Debtors felt it desirable to provide for parking in a nearby facility for its season ticket holders, and suite holders. What the parties then did was enter into an oral agreement in August, 2000, pursuant to which season ticket holders and suite holders could park in the East Garage. Moreover, they could use the coupons from their parking passes in Cinergy Field parking for payment in the East Garage. Central Parking System operated East Garage as well as the remaining parking at Cinergy Field. CEA would pay claimant through Central Parking $5.00 per coupon for Cyclones games, and $6.00 per coupon for family shows and concerts. Central Parking would invoice Debtors after an event in accordance with that schedule. CEA paid such invoices until sometime in November, 2000. It did not then pay invoices until after the bankruptcy was filed, March 15, 2001. The amount in controversy here is $45,339.99, the net of $47,161.00, the total of unpaid invoices for the interim period after November, 2000, less a credit of $1,822.00.

Prior to August, 2000, there were approximately 3,600 parking spaces in Cinergy Field, including Lot 6. After the demolition began, 2,289 parking spaces were left in Cinergy Field, so that the demolition removed approximately 1,300 spaces from Cinergy Field parking. There are 1,068 parking spaces in East Garage.

■ The factual background laid out above brings us to the controversy between Claimant and Debtors. What that controversy is must be defined with some care. There is no dispute between the parties that something consensual occurred in August, 2000. The nature of that consensual something is the issue to be determined by the court. Claimant's position is that that consensual something

was a modification of the Lease Agreement, while it is the position of Debtors that the consensual something was a separate and independent contract. That issue must be resolved in accordance with the law of contracts.

■ It is fundamental in the law of contracts that the guiding principle for interpretation in contract law is the ascertainment of the intention of the parties. When the parties agreed to something in August, 2000, was it their intention to modify the Lease Agreement, or was it their intention that they were agreeing on the terms of a new and independent contract? The court has reached the conclusion that the consensual something agreed to by the parties in August, 2000 was a separate and independent contract. *The reason that there was a consensual agreement in August, 2000, was because the parties would not agree to modify the Lease Agreement.* In the face of that uncontroverted fact, there is no room for Claimant's argument that what happened in August, 2000, was an oral modification of the Lease Agreement.

While Claimant argues for a different outcome on the basis that the consensual something was merely an application of the Lease Agreement, it offers no authority to support its position that, even if this is true, this must lead to a conclusion in its favor. Claimant argues further that *Software Clearing House, Inc. v. Intrak, Inc.,* 66 Ohio App.3d 163, 171, 583 N.E.2d 1056 (1990) compels a conclusion that the consensual something was a modification of the Lease Agreement. While *Software Clearing House* does recognize that an oral agreement can modify a prior written agreement, see also 17 Am.Jur.2d § 527, that authority cannot apply where the parties do not intend, as is the case here, a modification. Another argument by Claimant is that the manner of dealing with suite, club seat, and season ticket

patron parking was unchanged as between Lot 6 and the East Garage, and this supports its position that the August, 2000 agreement was but a modification of the Lease Agreement. But, as is clear from the facts recited above, there was a fundamental change in how such parking was dealt with. Prior to August, 2000, Central Parking remitted to Debtors its share of parking fees collected for Lot 6, determined by the formula in the Lease Agreement. After August, 2000, that procedure was changed. First, Central Parking did not remit to Debtors, but instead it billed Debtors for payment. Secondly, the amount charged for such parking in the East Garage was at a different rate than had been charged for parking at Lot 6.

■ Finally, Claimant argues that because Debtors did not list the oral agreement as an executory contract in their bankruptcy filings, this must mean that they regarded the oral agreement as part of the Lease Agreement. This argument is also without merit, for there is no reason that the oral agreement could not be a separate executory contract which was not scheduled in the bankruptcy.

In the light of the foregoing discussion, the application by Claimants for allowance of a cure claim is denied. The amount sought by Claimant as a cure claim, since it is for an alleged pre-petition debt, would be an unsecured claim.

## JUDGMENT ON DECISION BY THE COURT RE CLAIMANT'S CURE CLAIM

The application of Hamilton County Board of County Commissioners for an amount to cure a default in an unexpired lease having come on for consideration before the court, Honorable Burton Perlman, United States Bankruptcy Judge, presiding, and the issues having been duly con-

sidered and a decision having been rendered,

It is Ordered and Adjudged that the application is denied.