OPINION
{¶ 1} Defendant-appellant, LaserLine Corporation (LaserLine), appeals from the decision of the Mahoning County Court of Common Pleas granting summary judgment in favor of plaintiffs-appellees (collectively "Cafaro"), The Cafaro Company, John J. Cafaro (J.J.), and Cafaro Laser, Ltd. (Cafaro Laser) and denying its cross-motion for summary judgment.
 {¶ 2} This case is based on claims by Cafaro on six promissory and cognovit notes (Notes) executed by LaserLine in favor of Cafaro. A history of the facts leading up to this appeal is helpful. The facts date back to 1994 when Mark Eddington (Eddington), CEO and owner of UML Financial Group (UML) became acquainted with Dr. Allen Vetter (Dr. Vetter), one of the inventors of a laser based visual landing aid to be used as a navigational system for aircraft (landing aid). Dr. Vetter was seeking investment in his company, Laser Guidance, Inc. The two parties decided that UML would obtain exclusive marketing rights for the landing aid. Laser Guidance, Inc. then created a new company, Laser Guidance, Inc. of California to handle the civilian manufacturing rights to the landing aid and renamed Laser Guidance, Inc. to Laser Guidance, Inc. of Washington to handle the military manufacturing rights. Once Eddington received the exclusive marketing license for the civilian rights to the landing aid, he formed LaserLine to handle the marketing rights.
 {¶ 3} The marketing agreement required LaserLine to purchase a minimum number of landing aids per year from Laser Guidance, Inc. of California. In an attempt to raise operating capital, Eddington met with J.J. According to Eddington, J.J. agreed to invest in LaserLine in exchange for 20 percent of the company with an option for another 20 percent. Subsequently, LaserLine executed six promissory notes with interest rates of 12 percent, each secured by stock in Laser Guidance, Inc. of California and some of the landing aids. On June 20, 1996, LaserLine executed a promissory note on a loan in favor of The Cafaro Company for $1,115,750.00. On October 10, 1996, LaserLine executed a second promissory note on a loan in favor of The Cafaro Company for $215,150.00. On November 22, 1996, LaserLine executed a third promissory note on a loan in favor of The Cafaro Company for $500,000.00. LaserLine and/or J.J. leased a King Air aircraft to use for certification flights. The lease required a $40,000.00 deposit, which LaserLine did not have; so, Eddington and J.J. each paid $20,000.00 of the deposit. This led to LaserLine executing a cognovit note, this time in favor of J.J. for $20,000.00, on April 23, 1997. On June 11, 1997, LaserLine executed a cognovit note for $36,112.00 in favor of Cafaro Laser. Finally, on June 12, 1997, LaserLine executed another cognovit note in favor of Cafaro Laser for $38,888.00.
 {¶ 4} On July 31, 1997, Cafaro demanded payment from LaserLine on all of the notes according to their terms plus interest accrued. The parties held a meeting on August 7, 1997 to determine if they could reach an amicable resolution to their dispute. Present at the meeting were Eddington, J.J., Jeffrey Cottrell, Dr. Vetter, Dr. Shemwell, Don DeSalvo (DeSalvo), Robert Crivello, and Capri Cafaro (Capri). At the meeting, a document was written by DeSalvo. LaserLine and Cafaro dispute what the intent of this document was. The document was entitled "Memorandum of Understanding and Agreement" (Memo Agreement). LaserLine contends that the Memo Agreement is a binding contract while Cafaro maintains that it is merely a letter of intent to explore a business solution to the debt. The Memo Agreement sets out obligations and restrictions on the parties.
 {¶ 5} The most significant provision in the Memo Agreement dealt with LaserLine's obligation on the Notes. It stated:
 {¶ 6} "Cafaro agrees that those certain promissory notes made by Laserline in favor of The Cafaro Company, Cafaro Laser Ltd. and J.J. Cafaro shall no longer be an obligation of Laserline upon formation of the LLC and issuance of the shares of same to the shareholders as delineated herein. Cafaro shall not require payment of interest of principal of such notes if until such formation of such LLC occurs." (Memo Agreement, paragraph 6).
 {¶ 7} Cafaro formed a limited liability company, U.S. Aerospace Group, L.L.C. (Aerospace), on September 25, 1998. The membership interests were distributed at that time; however, no interest was assigned to LaserLine. Cafaro contends that Aerospace was not the entity contemplated by the Memo Agreement.
 {¶ 8} After signing the Memo Agreement, LaserLine alleges that it complied with all of its terms and that Cafaro complied with many of the terms. One of the terms called for LaserLine to hold Cafaro harmless on the King Air aircraft lease. Cafaro alleges that LaserLine demonstrated that it did not intend to be bound by the Memo Agreement by failing to defend or indemnify J.J. in a lawsuit brought by Executive Leasing for debt accrued on the aircraft lease. Executive Leasing eventually dismissed J.J. from that lawsuit but not until he incurred $1,472.10 in legal fees.
 {¶ 9} On April 8, 1998, The Cafaro Company, J.J., and Cafaro Laser filed separate lawsuits against LaserLine to collect payment on their respective Notes. LaserLine filed answers and counterclaims alleging the Notes were extinguished by the Memo Agreement, that LaserLine was entitled to a 20 percent share in Aerospace and representation on the board of directors, and that LaserLine was entitled to UCC lien releases on certain landing aids it owned. Upon LaserLine's motion, the trial court consolidated the lawsuits. On August 12, 1998, Cafaro amended its complaint to add a fraud count against LaserLine for the recovery of money J.J. spent in reliance on what he alleged to be a false promise by LaserLine and to declare that LaserLine had no rights under the Memo Agreement.
 {¶ 10} On October 10, 2000, Cafaro filed a motion for summary judgment. In addition to asking for judgment on all claims, Cafaro stated that it was retaining collateral (certain stock and equipment) in satisfaction of the first Note and requested judgment formally declaring it the owner of the collateral. LaserLine filed a cross-motion for summary judgment. LaserLine also filed a motion for leave to amend counterclaim instanter to plead a cause of action for what it alleged was undervaluing of collateral by Cafaro and sought judgment against Cafaro for the difference in the valuations. The trial court initially granted LaserLine's motion to amend its counterclaim, but it later vacated its prior ruling stating that it improvidently granted the motion and stating that it would decide the issue with the motions for summary judgment.
 {¶ 11} On March 9, 2001, the trial court granted Cafaro's motion for summary judgment on its claim and on the counterclaim and denied LaserLine's motion for summary judgment. The court ruled that Cafaro was the sole owner of the collateral it kept in satisfaction of the first Note, entered judgment for Cafaro in the amount of $810,150.00 plus interest on the remaining Notes, and entered judgment for J.J. on his fraud claim for $1,472.10. It also implicitly denied LaserLine's motion to amend its counterclaim. LaserLine filed its timely notice of appeal on April 6, 2001.
 {¶ 12} LaserLine raises two assignments of error, the first of which states:
 {¶ 13} "THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING APPELLANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN ENTERING JUDGMENT FOR APPELLEES ON THEIR MOTION FOR SUMMARY JUDGMENT."
 {¶ 14} The Ohio Supreme Court set out the standard for considering motions for summary judgment in Dresher v. Burt (1996), 75 Ohio St.3d 280. The court stated:
 {¶ 15} "[W]e hold that a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence [emphasis sic.] of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." Id. at 293.
 {¶ 16} Civ.R. 56(C) provides that the trial court shall render summary judgment if no genuine issue of material fact exists and when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. State ex rel. Parsons v. Flemming (1994),68 Ohio St.3d 509, 511. When reviewing a summary judgment case, appellate courts are to apply a de novo standard of review. Cole v. AmericanIndus. and Resources Corp. (1998), 128 Ohio App.3d 546, 552.
 {¶ 17} Summary judgment is appropriate when there is no genuine issue of material fact. A "material fact" depends on the substantive law of the claim being litigated. Hoyt, Inc. v. Gordon Assoc., Inc.
(1995), 104 Ohio App.3d 598, 603.
 {¶ 18} LaserLine breaks down its first assignment of error into six issues for review. We will address each one separately. LaserLine's first issue for review is:
 {¶ 19} "Was the Agreement a binding and enforceable contract?"
 {¶ 20} LaserLine contends that the Memo Agreement was a binding contract between the parties; thus, according to its terms, the Notes were discharged upon the formation of Aerospace. To support its contention that the Memo Agreement was a contract, LaserLine points our attention to its language, the parties' other writings and the parties' conduct. In response, Cafaro alleges the preamble to the Memo Agreement, where the parties agree to "restructure their relationship" and be "legally bound," was only an agreement to attempt to create a new business entity. Next, Cafaro argues that since the conditions precedent to the forgiveness of the Notes were legal impossibilities, LaserLine's argument has no merit. The two conditions precedent to the discharge of the Notes were that: (1) the parties form a limited liability corporation; and (2) the shares were distributed as delineated in the Memo Agreement. Finally, Cafaro asserts that its actions after it decided not to continue its business relationship with LaserLine are irrelevant to this case.
 {¶ 21} To prove the existence of a contract, a party must establish the essential elements of a contract: (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) an exchange of consideration; and (5) certainty as to the essential terms of the contract. Juhasz v. Costanzo, 7th Dist. No. 99-CA-294, 2001-Ohio-3338.
 {¶ 22} The language of the Memo Agreement indicates that it is a contract. The preamble states: "NOW THEREFORE in consideration of these premises and TEN DOLLARS ($10.00) and other valuable consideration, theparties receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows." The words "agree" and "agrees" appear at least twenty times in the body of the Memo Agreement and the word "shall" appears at least twenty-four times.
 {¶ 23} The only language that tends to support the view that the Memo Agreement is not a contract is as follows. Paragraph 21 states: "In the event, for any reason, Cafaro refuses to conclude this transaction per this agreement, Laserline shall have" thirty days to purchase Laser Guidance. Paragraph 21 also states: "Cafaro shall give thirty (30) days notice of its intent not to continue with the project." Paragraph 25 states: "The parties agree to enter into and execute any and all documents necessary to effect the intent, terms and conditions and clarification of this agreement." However, the inclusion of these provisions does not negate the fact that the Memo Agreement is a contract. Although paragraph 21 provides an "out," so to speak, for Cafaro, such a provision does not undo the contract. The rest of the language of paragraph 21 lends further support since it provides that if Cafaro exercises this "out," LaserLine shall receive 30 days to purchase Laser Guidance for $12,000,000.00 and that such time limit shall be extended upon a deposit of $500,000.00. Thus, in exchange for the "out" for Cafaro, LaserLine received this option to purchase Laser Guidance. Additionally, the language in paragraph 25 does not indicate that the parties have not yet entered into a contract. It only states that all of the parties to the contract will take the necessary actions to complete the transactions as set out in the contract.
 {¶ 24} The Memo Agreement language demonstrates all of the essential elements of a contract. All parties made their offers of what they would do in the terms of the Memo Agreement. All parties accepted the other parties' offers by signing the Memo Agreement. Since this is an express contract, the parties' offer and acceptance demonstrates their meeting of the minds. Reali, Giampetro Scott v. Soc. Natl. Bank
(1999), 133 Ohio App.3d 844, 849. The consideration is stated in the preamble to the Memo Agreement, "in consideration of these premises and TEN DOLLARS ($10.00) and other valuable consideration, * * * receipt and sufficiency of which is hereby acknowledged." As to the final contractual element, the Memo Agreement states with reasonable certainty the essential terms of the agreement. The Memo Agreement clearly identifies the obligations of each of the parties including: the formation of a new business entity; how the new entity will be set up; the forgiveness of the Notes; the liability of LaserLine for the King Air lease; the designation of which parties will pay certain expenses; and the marketing areas in which LaserLine will have the right to market the landing aids.
 {¶ 25} Since the Memo Agreement is a contract, the parties' arguments regarding extrinsic evidence are moot and we shall continue to consider LaserLine's second issue for review.
 {¶ 26} LaserLine's second issue for review is:
 {¶ 27} "Does the Agreement's reference to a `limited liability corporation' rather than a `limited liability company' or to a `corporation' affect the Agreement's validity?"
 {¶ 28} LaserLine argues the fact that the Memo Agreement states that the parties will form a "limited liability corporation" instead of "limited liability company" does not preclude the binding nature of the Memo Agreement. It maintains that the use of the word "corporation" instead of "company" does not detract from the fact that the parties intended to form an entity and delineated the ownership interest, funding, and representation of such entity. In contrast, Cafaro contends that because a "limited liability corporation" does not exist under Ohio law, the Memo Agreement was not binding.
 {¶ 29} When construing a contract, courts should prefer a meaning that gives the contract vitality rather than a meaning, which renders its performance illegal or impossible. Kebe v. Nutro Machinery Corp. (1985),30 Ohio App.3d 175, paragraph one of the syllabus. Furthermore, contracts should not to be construed so as to arrive at absurd or impossible results. Brannon v. Troutman (1992), 75 Ohio App.3d 233, 237, quotingCincinnati v. Cameron (1878), 33 Ohio St. 336, 364.
 {¶ 30} Paragraphs two through five of the Memo Agreement address the formation of the new business entity. Paragraph two states the parties agree that a new "Limited Liability Corporation (LLC) will be formed in accordance with the laws of the State of Ohio or any other jurisdiction as directed by Cafaro so long as such jurisdiction is within the U.S.A." All other references to the business entity refer to the "LLC." When reading the entire Memo Agreement, it is clear the parties intended to create a new business entity. The Memo Agreement designates percentages of ownership amongst the parties, it gives Cafaro the responsibility for the funding, and it delegates the initial representation on the board of directors.
 {¶ 31} Cafaro is correct in stating a limited liability "corporation" does not exist under Ohio law. Under Ohio law, one can form a "limited liability company" or a "corporation," in addition to other business entities. R.C. 1701.; R.C. 1705. The Memo Agreement provides for the percentages of ownership among the parties. Such an arrangement is consistent with a limited liability company. R.C. 1705.24. Additionally, the designation "LLC" refers to a limited liability company. The Memo Agreement also provides for the number of seats each party will have on the board of directors. This designation is consistent with a corporation. R.C. 1701.55 through R.C. 1701.59. Thus, it is not clear from the terms of the Memo Agreement which entity the parties intended to form. Additionally, by the terms of the Memo Agreement, the parties are not required to form the new business entity in Ohio.
 {¶ 32} Although it is not apparent which type of business entity the parties intended to form, we shall not construe the contract so as render it impossible to complete. The parties obviously intended to form a business entity and set out details for their new business. Thus, the terms "limited liability corporation" and "LLC" are ambiguous and create a question of fact. "[W]hen contract terms are ambiguous and one interpretation supports some recovery for the defendant, the trial court may not enter summary judgment in favor of the plaintiff." FrenchtownSquare Partnership v. Lemstone, Inc., 7th Dist. No. 99-CA-300, 2001-Ohio-3245. Accordingly, LaserLine's second issue for review has merit.
 {¶ 33} LaserLine's third issue for review is:
 {¶ 34} "Did [LaserLine] satisfy conditions precedent under the Agreement to the extinguishment of its liability under the subject notes?"
 {¶ 35} LaserLine maintains that the LLC as contemplated by the Memo Agreement was formed; therefore, it is no longer liable on the Notes.
 {¶ 36} Paragraph six of the Memo Agreement provides that Cafaro will forgive the Notes "upon formation of the LLC and issuance of the shares of same to the shareholders as delineated herein. Cafaro shall not require payment of interest of principal of such notes if until such formation of such LLC occurs." Accordingly, if the LLC or business entity as contemplated by the Memo Agreement was formed, then Cafaro should have forgiven the Notes.
 {¶ 37} It is not apparent whether the LLC as contemplated by the parties in the Memo Agreement was formed. Paragraph three of the Memo Agreement provides that the initial ownership of the LLC would be as follows: 20 percent to LaserLine; ten percent to Dr. Shemwell, Dr. Vetter, and Joseph R. Hartt; 60 percent to Cafaro; five percent to employees of the LLC, if directed by Cafaro; and five percent to others as directed by Cafaro. On September 25, 1998, the limited liability company U.S. Aerospace Group, LLC was formed. (Marando Affidavit, Exhibit A). Signing the Articles of Organization as members were Cafaro, Laser, Dr. Shemwell, Dr. Vetter, Richard Detore, and Brita Elizabeth Hartt as personal representative of the Estate of Joseph Roy Hartt. Thus, the membership in Aerospace was substantially similar to the ownership set out in the Memo Agreement with the exception that LaserLine was not included in Aerospace.
 {¶ 38} Cafaro argues that it did not distribute the "shares" to the "shareholders" as was called for in the Memo Agreement. However, membership interests were distributed to the owners of Aerospace. The use of the words "shares" and "shareholders" in the Memo Agreement does not preclude Aerospace from being the business entity contemplated by the Memo Agreement. Furthermore, even though Aerospace was not officially formed until September of 1998, it appears that Cafaro was operating as Aerospace as early as January 15, 1998 and that Aerospace was in fact the entity contemplated in the Memo Agreement. On this date, Capri sent two letters to Eddington. Both letters were typed on USAerospace letterhead. In the first letter she wrote:
 {¶ 39} "It has been brought to our attention that you will be speaking on the subject of Laser Landing Systems at the SAI meetings in Melbourne, FL on 3 February, 1997. May I remind you, that under the agreement with Cafaro, DBA, USAerospace you were specifically given the geographic areas of Mexico and South America to promote the sale of the product.
 {¶ 40} "If you speak at this meeting, it will be a direct violation of the above stated agreement and LaserLine is subject to having all rights set forth under this agreement revoked.
 {¶ 41} "I remind you to review the terms of our agreement." (Eddington Affidavit, Exhibit 3).
 {¶ 42} In the second letter Capri wrote:
 {¶ 43} "It has been brought to our attention by the FAA, that you have recently operated the Laser Landing system at Bermuda Dunes. Let me remind you that to operate this system inside the United States requires authorization by the FAA and USAerospace Group.
 {¶ 44} "We are investigating this accusation, if it is found to be true, it will be a direct violation of the agreement with Cafaro, DBA, USAerospace, where as, you were specifically given the geographic areas of Mexico and South America to promote the sale and operation of the product.
 {¶ 45} "At the outcome of our investigation, if it is found that you did operate the system at Bermuda Dunes without the proper authorization, all rights under the agreement can be revoked." (Eddington Affidavit, Exhibit 4).
 {¶ 46} Although Cafaro denies that Aerospace was the business entity contemplated by the Memo Agreement, these letters demonstrate otherwise. Thus, a genuine issue of material fact exists as to whether Aerospace was the entity intended in the Memo Agreement. Therefore, LaserLine's third issue for review has merit.
 {¶ 47} LaserLine's fourth issue for review is:
 {¶ 48} "Did [Cafaro] have the right to unilaterally terminate the Agreement?"
 {¶ 49} LaserLine contends that Cafaro did not have the right to unilaterally terminate the Memo Agreement. It insists that although the Memo Agreement gave Cafaro the right to walk away from the project with the inventors, it did not give Cafaro the right to unilaterally terminate its obligations to form the LLC and cancel the Notes. Cafaro argues that since, under the Memo Agreement, it agreed to take on the bulk of the project (i.e., to form, fund, and operate a new business) it insisted on a provision whereby it could withdraw. (Memo Agreement, paragraph 21). Additionally, Cafaro contends that LaserLine's argument that Cafaro's right to unilaterally terminate the Memo Agreement makes the promises in the Memo Agreement illusory, gives further support to its contention that the Memo Agreement was a letter of intent and not binding.
 {¶ 50} Paragraph 21 of the Memo Agreement provides:
 {¶ 51} "In the event, for any reason, Cafaro refuses to conclude this transaction per this agreement, LaserLine shall have:
 {¶ 52} "Thirty (30) days to purchase Laser Guidance for $12,000,000.00. Such thirty day period shall be extended for a period of sixty (60) days by paying $500,000.00 to Laser Guidance Inc. of CA and of WA.
 {¶ 53} "Cafaro shall give thirty (30) days notice of its intent not to continue with the project."
 {¶ 54} This provision indicates Cafaro had the right to walk away from the entire agreement. However, this right does not render the whole agreement illusory since in exchange for Cafaro's right to walk away, LaserLine received the option of purchasing Laser Guidance.
 {¶ 55} The one problem that exists in relation to this "walk away" provision is the notice requirement. The provision states that Cafaro must give 30 days notice of its intent not to continue. The evidence does not indicate that Cafaro complied with this provision. Cafaro claims that by filing the lawsuit against LaserLine it gave notice of its intent not to continue with the transaction. LaserLine counters by arguing that after filing the lawsuit Cafaro continued the transaction with the inventors.[1]
 {¶ 56} There is no evidence on the record that after Cafaro filed the lawsuit LaserLine attempted to exercise its right to purchase Laser Guidance. However, when viewing the evidence in the light most favorable to LaserLine, Cafaro's actions after it filed the lawsuit on April 8, 1998 tend to indicate that it continued the transaction as planned in the Memo Agreement with the inventors. It is possible that Cafaro and the inventors formed Aerospace pursuant to the Memo Agreement and failed to include LaserLine. As stated above, the evidence is uncontested that Cafaro and the inventors formed the limited liability company, Aerospace, on September 25, 1998. Therefore if Aerospace was indeed formed pursuant to the Memo Agreement, then questions of fact exist as to whether Cafaro proceeded with the transaction set out in the Memo Agreement with the inventors and whether it met the notice provision thus triggering LaserLine's option to purchase Laser Guidance. Hence, LaserLine's fourth issue for review has merit.
 {¶ 57} LaserLine's fifth issue for review is:
 {¶ 58} "Did the alleged breach of the Agreement by LaserLine in not holding J.J. Cafaro harmless for the lease of the King Air aircraft excuse [Cafaro's] performance under the Agreement?"
 {¶ 59} LaserLine contends that it did not breach the Memo Agreement but, even if it did, this breach was not material. Although LaserLine denies breaching the Memo Agreement, it seems apparent that it did so. Paragraph seven provides in pertinent part:
 {¶ 60} "Cafaro and Laserline agree that Cafaro shall assume no liability with regard to that certain Lease Agreement for the lease of that certain `King Air' (F-90 modle [sic.]) aircraft leased by Laserline for use in FAA Certification process in Manassas, VA."
 {¶ 61} LaserLine presented no evidence that it attempted to hold Cafaro harmless on the King Air lease. Thus, the relevant question becomes: Did LaserLine's breach excuse Cafaro's performance? "A breach of a portion of the terms of a contract does not discharge the obligations of the parties to the contract, unless performance of those terms is essential to the purpose of the agreement." Software ClearingHouse, Inc. v. Intrak, Inc. (1990), 66 Ohio App.3d 163, 170. There are five factors that can be used to determine the materiality of a breach: (1) the extent to which the injured party will be deprived of the expected benefit; (2) the extent to which the injured party can be adequately compensated for the lost benefit; (3) the extent to which the breaching party will suffer a forfeiture; (4) the likelihood that the breaching party will cure its breach under the circumstances; (5) and the extent to which the breaching party has acted with good faith and dealt fairly with the injured party. Id. at 170-71.
 {¶ 62} Cafaro claims that since it asked very little of LaserLine under the Memo Agreement, the breach was material. Cafaro submitted J.J.'s affidavit in support. J.J. stated the hold harmless provision was a significant factor in the execution of the Memo Agreement because he did not want to expose Cafaro to liability. (J.J. affidavit). LaserLine asserts that since the breach only cost Cafaro $1,472.10 while the entire contract is worth millions of dollars, the breach was immaterial. It is also worth noting that LaserLine can easily compensate Cafaro for the breach by reimbursing J.J. the $1,472.10. Whether LaserLine's breach of the Memo Agreement was material presents a question of fact thus precluding summary judgment. Therefore, LaserLine's fifth issue for review has merit.
 {¶ 63} LaserLine's sixth issue for review is:
 {¶ 64} "Did the trial court err as a matter of law in ruling on [Cafaro's] retention of the collateral?"
 {¶ 65} Based on the merit of the preceding issues for review, this issue for review is moot. Accordingly, since several genuine issues of material fact exist, LaserLine's first assignment of error has merit.
 {¶ 66} LaserLine's second assignment of error states:
 {¶ 67} "THE TRIAL COURT ERRED AS A MATTER OF LAW IN GRANTING JUDGMENT TO J.J. CAFARO ON HIS FRAUD CAUSE OF ACTION IN THE AMOUNT OF $1,472.10."
 {¶ 68} LaserLine argues that that the court should not have awarded judgment to J.J. on his fraud claim. It argues that J.J. never had to pay the lease payments for which it agreed to hold him harmless; he only incurred attorney's fees. Additionally, LaserLine contends that J.J. did not prove the elements required for a fraud cause of action.
 {¶ 69} The elements of fraud are: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. Geo-Pro Serv., Inc. v. Solar TestingLaboratories, Inc. (2001), 145 Ohio App.3d 514, 526.
 {¶ 70} In the present case, the trial court found that LaserLine failed to present any evidence challenging the facts as set forth by Cafaro. Therefore, the court awarded judgment in favor of J.J. for $1,472.10.
 {¶ 71} Paragraph seven of the Memo Agreement provides in pertinent part:
 {¶ 72} "Cafaro and Laserline agree that Cafaro shall assume no liability with regard to that certain Lease Agreement for the lease of that certain `King Air' (F-90 modle [sic.]) aircraft leased by Laserline for use in FAA Certification process in Manassas, VA."
 {¶ 73} In support of his claim for fraud, J.J. presented his affidavit in which he stated the following. Two days before the August 7, 1997 meeting, he received word that LaserLine was possibly in default on the aircraft lease. The parties discussed this issue at the meeting and LaserLine assured J.J. that Cafaro would face no liability on the lease as was memorialized in paragraph seven of the Memo Agreement. J.J. stated that paragraph seven was a significant factor in the execution of the Memo Agreement and the possible business relationship because he was aware of LaserLine's proclivity to accumulate debt and did not want to create exposure for The Cafaro Company, Cafaro Laser, or himself. On September 25, 1997, J.J. received his first legal threat concerning the lease. Executive Leasing was of the belief that J.J. was jointly liable on the debt LaserLine had accrued on the lease. Executive Leasing named J.J. as a co-defendant in its collection case against LaserLine. J.J. made three separate demands on LaserLine to defend and indemnify him on this claim. LaserLine did not respond to these demands. J.J. was then forced to retain legal counsel in North Carolina, where the suit was filed. On June 5, 1998, Executive Leasing voluntarily dismissed J.J. from its lawsuit, but not until he incurred $1,472.10 in legal expenses. J.J. concluded that LaserLine knowingly made a false representation of indemnity in the Memo Agreement with the intent to gain his trust and mislead him into signing the Memo Agreement, which he relied upon to his financial detriment.
 {¶ 74} Civ.R. 56(E) provides:
 {¶ 75} "* * * When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party."
 {¶ 76} According to Civ.R. 56(E), since LaserLine failed to refute the evidence in J.J.'s affidavit, summary judgment was appropriate if J.J.'s affidavit along with the Memo Agreement support his claim for fraud.
 {¶ 77} J.J. met the first two elements of fraud. LaserLine made a representation that Cafaro would not assume any liability for the aircraft lease. In addition, J.J. stated that LaserLine's representation on this matter played a material role in Cafaro signing the Memo Agreement and entering into a possible business relationship. J.J. also met the fifth and sixth fraud elements. He relied on LaserLine's representation in the Memo Agreement to his detriment. However, questions of fact surround whether J.J. met the third and fourth elements. In his affidavit, J.J. stated that based on all that transpired, "I can only conclude that representatives of LaserLine knowingly made its false representation of indemnity in the Memorandum with the intent to gain my trust and mislead me into signing the Memorandum." J.J. does not assert that he knows that LaserLine made its representation falsely with the intent to mislead him into relying on it. He simply makes a conclusory statement based on his own opinion. Cafaro did not produce any other evidence to support J.J.'s fraud claim. Accordingly, summary judgment was not appropriate, as genuine issues of material fact exist as to whether LaserLine made its representation falsely with the intent of misleading J.J. to rely on it. Thus, LaserLine's second assignment of error has merit.
 {¶ 78} For the reasons stated above, the decision of the trial court is hereby reversed and remanded for further proceedings according to law and consistent with this opinion.
Vukovich, J., concurs.
Waite, J., concurs.
[1] {¶ a} The inventors were also parties to the Memo Agreement and the notice provision does not state that it applies only to LaserLine. Thus, the notice provision applied to the inventors as well.